## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA      :

                                  :

         v.                      :       Criminal Action No.:  12-cr-231 (RC)

                                    :

JAMES HITSELBERGER,         :       Re Document No.:     34,38,39,50

                                    :

       Defendant.              :

## <u>MEMORANDUM OPINION</u>

**DENYING DEFENDANT'S MOTIONS TO SUPPRESS TANGIBLE EVIDENCE SEIZED, DENYING DEFENDANT'S MOTION TO DISMISS COUNTS FOUR, FIVE AND SIX OF THE SUPERSEDING INDICTMENT, AND GRANTING IN PART AND DENYING IN PART THE GOVERNMENT'S MOTION FOR 404(B) EVIDENCE**

## I.  INTRODUCTION

This opinion resolves four of the five remaining motions in the criminal case against James F. Hitselberger: the defendant's motions to (1) suppress documents seized after the search of his backpack, (2) suppress a document seized after the search of his room, and (3) dismiss the counts that allege violations of 18 U.S.C. § 2071, as well as (4) the government's motion to admit evidence of other acts under Rule of Criminal Procedure 404(b).  The defendant's motion to suppress certain statements will be addressed in a separate opinion.

## II.  BACKGROUND

### A.  NSA Bahrain

Most of the events at issue in these motions took place in April 2012, on a United States naval base known as Naval Support Activity Bahrain ("the naval base" or "NSA Bahrain").  It was—and presumably still is, though the evidence presented here was limited to that time

period—a small base, perhaps a mile across, Tr. 9:8[1], located in the Juffair section of Manama, which is the capital of Bahrain, Tr. 97:21–23. The base was surrounded by 15-foot-high, wire-topped concrete walls in some places, Tr. 9:10, and by a simple fence in others, Tr. 98:6–7. It had three entry points: one accessible only to pedestrians, another only to motor vehicles, and a third accessible to both. Tr 9:12–15. At each gate a sign was posted, which stood several feet high by several feet wide and read:

<u>WARNING</u>

U.S. NAVY PROPERTY

AUTHORIZED PERSONNEL ONLY


AUTHORIZED ENTRY ONTO THIS IN-

STALLATION CONSTITUTES CONSENT

TO SEARCH OF PERSONNEL AND THE

PROPERTY UNDER THEIR CONTROL.


INTERNAL SECURITY ACT OF 1950

SECTION 21:50, U.S.C. 797


Gov't Exhs. 2–3, 5–6, 9.[2] Armed guards manned the gates and patrolled the interior of the base. Tr 9:15, 19, 25.

---

[1] An evidentiary hearing was held on September 6, 2013. The transcript from that hearing will be referred to as "Tr.", while the transcript from the oral argument held on September 9, 2013 will be referred to as "Arg. Tr.".

[2] The exhibits indicate that the signs rested on the ground and were not affixed to any wall. The signs also appear to be damaged. Testimony at the evidentiary hearing indicated that such signs were present in April 2012. Tr. 104:4; 142:4–14.

## B.  Events Before the Searches

On the morning of April 11, 2012, Master Sergeant Michael Alan Holden and defendant James F. Hitselberger were at work in a restricted access area on the naval base.  A civilian linguist, Mr. Hitselberger worked with a team of three other translators to prepare Navy SEALs to travel to countries in the Persian Gulf region and teach classes in Arabic there.  Tr. 8:6–17.  The SEALs were members of the Military Information Support Group, formerly known as Psychological Operations.  Tr 6:13–16.  Master Sergeant Holden was their detachment sergeant.  Tr. 7:3, 8:21.

According to the testimony of Master Sergeant Holden, who had arrived at the base on April 6, Tr 6:24, the civilian linguists worked together—apparently with pen and paper—at a conference table in the restricted access area.  Tr. 39:6–9.  They did not have their own computer workstations.  Instead, when a linguist needed to use a computer, whether to check his email or to type up a translation on which he had been working, he would sign on to a computer that was used by the officers who supervised his work.  Tr. 37:6–8.  These computers could access both classified and unclassified information, though not at the same time.  Tr. 18:7–10.  The mode in which the computers operated was controlled by removable hard drives.  Tr. 14:15.  If the classified hard drive—marked with a red sticker, Tr. 15:10—was inserted, the computer would operate in classified mode, and a small bar at the top of the computer would turn red, Tr. 15:8.  Conversely, the unclassified hard drive was marked with a green sticker, Tr. 15:12; when it was in use, the small bar on the computer would turn green, Tr. 15:9.

Not long after 11:00 a.m. on April 11, Mr. Hitselberger asked Master Sergeant Christensen if he could use his computer.  Tr. 17:12.  Mr. Hitselberger signed onto the computer, which contained Master Sergeant Dale Christensen's classified hard drive and was therefore

operating on its classified side, and began to read his own email. At some point, Master Sergeant Holden, who was standing directly behind Mr. Hitselberger and could clearly see the computer screen on which he was working, noticed that Mr. Hitselberger was reading a classified situation report. Tr. 18:16–18. Although Master Sergeant Holden would later learn that Mr. Hitselberger was on the distribution list for this report and was authorized to read it, Tr. 53:18–25, in that moment he found Mr. Hitselberger's behavior to be odd, Tr. 18:19–20. He turned to Master Sergeant Christensen and said so, then continued to observe Mr. Hitselberger. Tr. 19:17–23.

Master Sergeant Holden saw Mr. Hitselberger print the classified report and walk over to the printer to retrieve it. He then saw Mr. Hitselberger fold the report in half and place it in an English-to-Arabic dictionary. Tr. 19:25–20:11. Master Sergeant Holden again spoke to Master Sergeant Christensen, who turned to Mr. Hitselberger and asked him to sign off of the computer so that Master Sergeant Christensen could use it. Tr. 20:21–25. Mr. Hitselberger replied that he needed one minute to print something. He hit print, logged off of the computer, walked over to the printer, picked up the document, and put it in his backpack along with the dictionary. Mr. Hitselberger zipped up the backpack, threw it over his shoulder, and began to leave. Tr. 21:1–6, 25; 26:1.

### C. Search of Mr. Hitselberger's Bag

Master Sergeant Holden turned to Captain Hering and said that he needed the captain to come with him. Captain Hering was in the middle of a conversation and ignored Master Sergeant Holden, who grabbed his sleeve and pulled him toward the door. Tr. 22:8–16. When Master Sergeant Holden and Captain Hering left the restricted access area—a closed, elevated room in an open warehouse area—Mr. Hitselberger was already on the floor of the bay below; they had lost sight of Mr. Hitselberger for ten or fifteen—perhaps as many as twenty—seconds.

Tr. 22:23–23:25; 68:24–25.  As the two descended the stairs, Mr. Hitselberger left the building, and they lost sight of Mr. Hitselberger for another ten or fifteen seconds.  Tr. 22:23–23:25; 70:8.

When Master Sergeant Holden and Captain Hering emerged from the building, Mr. Hitselberger was fifteen or twenty feet ahead of them, and still had his backpack on his back.  Tr. 23:17–19; 24:3.  Master Sergeant Holden called for Mr. Hitselberger to stop and put his backpack on a nearby picnic table, which he did.  Tr. 24:10–14.  Master Sergeant Holden told him to open his backpack and remove the documents that he had seen him put into it.  Tr. 24:15–16.  Mr. Hitselberger reached into the bag and removed a document; Master Sergeant Holden looked at it quickly and noticed that it was marked "SECRET."  Tr. 24:17–19.  He folded the document, put it into his pocket, and told Mr. Hitselberger that he had seen him put more documents in his backpack.  Master Sergeant Holden told him to remove those documents, as well.  Tr. 24:19–23.  Mr. Hitselberger did so, and Master Sergeant Holden saw that those documents were marked "SECRET/NOFORN."  He again folded the documents and put them into his pocket.  Tr. 24:23–25, 25:1.  Neither Master Sergeant Holden nor Captain Hering physically searched Mr. Hitselberger's backpack.  Tr. 25:10–15.  The two conferred and decided to let Mr. Hitselberger go, which he did.  Tr. 26:9–13.  (He returned when asked to do so shortly thereafter, but those events are not relevant to these motions.)

### D.  Search of Mr. Hitselberger's Room

When he learned of these events, Special Agent Raffi Kesici of the Naval Criminal Investigative Service decided to request a command authorization to search Mr. Hitselberger's quarters and seize materials discovered there; he drafted that authorization and prepared an affidavit in support of his request.  Tr. 108:20–23.  While drafting those documents, Special Agent Kesici reviewed sworn statements made by Master Sergeant Christensen, Master Sergeant

Holden, and one Captain Thiel. Tr. 111:5–7. He also consulted with Staff Judge Advocate David Peck, who recommended a revision to his draft. Tr. 111:10–112:2. After Special Agent Kesici made the revision, he and SJA Peck went to meet with Captain Walsh, the base commander at NSA Bahrain. Tr. 112:3–12. Special Agent Kesici introduced himself and briefly summarized what had happened that day and why he believed that there was probable cause to search Mr. Hitselberger's quarters. He presented the draft command authorization to Captain Walsh, who took a moment to read it. Tr. 112:19—113:1. There was a brief exchange between Captain Walsh and Special Agent Kesici, which suggested to the Special Agent that Captain Walsh had already been briefed on the day's events. Tr. 113:4–15. Captain Walsh signed the command authorization; it was executed shortly thereafter. Tr. 113:16–21. The search uncovered an apparently classified document dated March 11, 2012. Tr. 114:22.

## III. ANALYSIS

### A. Motion to Suppress Documents Seized from Backpack

Mr. Hitselberger argues that the search of his backpack violated his Fourth Amendment rights, and that the documents seized in that search should therefore be suppressed. His chief contention—that no exception to the warrant requirement justified the warrantless search—will require careful consideration. But a preliminary argument can be dispensed with quickly. Having seen Mr. Hitselberger print classified documents, place them into his backpack, and leave the area in which classified documents were properly stored without following any of the procedures regarding the transportation of such documents, Master Sergeant Holden had a "reasonable, articulable suspicion" that Mr. Hitselberger was breaking the law. He was therefore entitled to stop him. *See United States v. Davis*, 235 F.3d 584, 586 (D.C. Cir. 2000) ("Investigative stops do not run afoul of the Fourth Amendment if they are based on 'reasonable,

articulable suspicion' of criminal conduct." (quoting *Illinois v. Wardlow,* 528 U.S. 191, 123 (2000))).

But he did not have a warrant to search Mr. Hitselberger's bag. The government makes two principal arguments that such a warrant was unnecessary. The government argues, first, that Mr. Hitselberger either had no reasonable expectation of privacy in his backpack or implicitly consented to the search when he came to live on NSA Bahrain.[3] In the alternative, the government argues that the search was justified by exigent circumstances.

If Mr. Hitselberger had been carrying a closed backpack down the streets of an American city, there is no question that he would have had a reasonable expectation of privacy in its contents, because "the Fourth Amendment provides protection to the owner of every container that conceals its contents from plain view." *United States v. Ross,* 456 U.S. 798, 822–23 (1982). Absent some applicable exception, a warrant would be required to search his backpack. And if Mr. Hitselberger had been a servicemember carrying a backpack on a military installation, he would also have enjoyed "the Fourth Amendment's basic protection against unreasonable searches and seizures," *United States v. Chapman,* 954 F.2d 1352, 1367 (7th Cir. 1992), because "the Fourth Amendment to the Constitution applies to servicemembers," *United States v. Muniz,* 23 M.J. 201, 204 (C.M.A. 1987); *accord United States v. Stuckey,* 10 M.J. 347, 349 (C.M.A. 1981) (concluding "that the Fourth Amendment does shield the American serviceperson"); *see also United States v. Brown,* 784 F.2d 1033, 1035–37 (10th Cir. 1986); *Garrett v. Lehman,* 751 F.2d 997, 1002–03 (9th Cir. 1985).

---

[3] The arguments are closely related. *See e.g.*, *United States v. Prevo*, 435 F.3d 1343, 1348 (11th Cir. 2006) (finding that "two signs warning visitors that cars entering the property are subject to search" diminish the visitor's expectation of privacy).

Of course, there are different expectations of privacy in the military than in civilian life. *United States v. Rendon*, 607 F.3d 982, 990 (4th Cir. 2010) ("[T]he Fourth Amendment protects members of the armed services from unreasonable searches and seizures, albeit with different standards than those that apply in the civilian context.") (citation omitted); *Chapman*, 954 F.2d at 1367 ("[T]he military implementation of [the Fourth Amendment] is different from that employed in civilian matters . . . ."). One chief difference is that servicemembers are subject to military inspections of their quarters, property, and persons. "A traditional 'military inspection' is understood to be the 'examination of the whole or part of a unit, organization, installation, vessel, aircraft, or vehicle, including an examination conducted at entrance and exit points . . . the primary purpose of which is to determine and to ensure the security, military fitness, or good order and discipline of the unit, organization, installation, vessel, aircraft, or vehicle.'" *Rendon*, 607 F.3d at 991 (quoting Mil. R. Evid. 313(b)). An inspection may be designed to confiscate contraband, but it may not be targeted at particular persons suspected of wrongdoing. *Id.*; *see United States v. Thatcher*, 28 M.J. 20, 24 (C.M.A. 1989) (explaining that "if an intrusion on privacy is really an 'inspection' and complies with Mil. R. Evid. 313, no reasonable expectation of privacy has been violated; but if the purported inspection is only a subterfuge for a search . . . then a violation has occurred"); *United States v. Middleton*, 10 M.J. 123, 132 (C.M.A. 1981) (holding that the "examination of [a] locker [which a drug-sniffing dog had identified] was not within the scope of the previously scheduled inspection and was [therefore] a search incident to a criminal investigation"); WILLIAM R. LAFAVE, 5 SEARCH AND SEIZURE § 10.7(c), at 388 (5th ed. 2012) (suggesting that "selective searches of persons or vehicles previously admitted to and now present on the [military] installation" are "more instrusive" than "routine inspections occurring at the entrance to the installation" because selective searches are "accusatory in nature, and thus

would not seem to be permissible merely because the individual previously elected to enter the base").

When wrongdoing is suspected, an investigatory search is conducted. Investigatory searches "are governed by Military Rules of Evidence 314 and 315 and by the more generally applicable principles of the Fourth Amendment." *Rendon*, 607 F.3d at 991. Rule 314 provides for searches where probable cause is not required; Rule 315 governs the authorization of probable cause-based searches of persons subject to military law or "situated on . . . a military installation" as well as searches of property so situated. Mil. R. Evid. 315(c)(3). "Under Military Rule of Evidence 315, an investigatory search of a . . . person or quarters may only be undertaken (absent exigent circumstances) when the investigator presents the military commander with information establishing that there is probable cause to believe that the area sought to be searched contains evidence of unlawful activity." *Chapman*, 954 F.2d at 1368–69.

Testimony at the evidentiary hearing indicated that inspections and searches at NSA Bahrain were conducted in accordance with the Military Rules of Evidence. Master Sergeant Holden recalled performing health and safety inspections of the linguists' quarters, with twenty-four hours' notice. Tr. 28:24–29:7. Special Agent Kesici testified that random searches for health and welfare were conducted at the naval base, but that command authorizations were sought for searches based on probable cause. Tr. 153:3–154:21. And Staff Judge Advocate Peck testified that:

> . . . generally, inspection is not a quest for evidence in a criminal case. An inspection is being done for security reasons. For example, you know, you're searching people coming on and off the installation, and that's a security—has a security purpose, not a criminal investigatory purpose. We have what is called health and comfort inspections in the units that they do in the barracks rooms to ensure that the people are maintaining the barracks in an appropriate sanitary manner, they have all the equipment they're supposed to have so they're operationally ready. They conduct those types of inspections. But a search

authorization would be sought when there was an actual desire to look for evidence for use in potential criminal [investigations].

Tr. 204: 8–21.

The Military Rules of Evidence suggest that servicemembers enjoy some legitimate expectations of privacy in their property and quarters, much as government workers can aquire a reasonable expectation of privacy in their office desks. See O'Connor v. Ortega, 480 U.S. 709, 716–719 (1987) (plurality opinion). Even though the government-as-employer is entitled to conduct inspections of the office space under its control, see id. at 717, and even though such inspections can reduce or eliminate an employee's expectation of privacy, see id., the mere possibility of inspection does not preclude a reasonable expectation of privacy, id. at 717–18 ("Individuals do not lose Fourth Amendment rights merely because they work for the government instead of a private employer. . . . Given the great variety of work environments in the public sector, the question whether an employee has a reasonable expectation of privacy must be addressed on a case-by-case basis."); see also Stewart v. Evans, 275 F.3d 1126, 1131 (D.C. Cir. 2002) ("O'Connor holds that an unreasonable search in the workplace violates the Fourth Amendment, and that the inquiry into reasonableness must be made on a case-by-case basis.").

In sum, if Mr. Hitselberger had been walking an American street, he would have enjoyed a reasonable expectation of privacy in the contents of his backpack. And if he had been a servicemember on a military installation, any search would have been subject to the Military Rules of Evidence, which (absent an applicable exemption) require investigatory searches of property to be supported by probable cause and authorized by the base commander. But Mr. Hitselberger was a civilian on a military installation—and the government argues that he consented to the search.

A base commander can, as a general matter, require consent to search as a condition of a civilian's entry onto the base. United States v. Jenkins, 986 F.2d 76, 79 (4th Cir. 1993); United States v. Ellis, 547 F.2d 863, 866 (5th Cir. 1977). Those conditions must of course be constitutional, but requiring visiting civilians to submit to a search upon request is a constitutional condition. Ellis, 547 F.2d at 866. Although a civilian must "freely and voluntarily" consent to such a search as a condition of entry, id. (quoting Bumper v. North Carolina, 391 U.S. 543, 548 (1968)), his consent need not be explicit—implicit consent will suffice, Morgan v. United States, 323 F.3d 776, 782 (9th Cir. 2003); Jenkins, 986 F.2d at 79. Whether an individual has in fact consented—freely and voluntarily, though implicitly—is determined by examining the totality of the circumstances. Jenkins, 986 F.2d at 79; Ellis, 547 F.2d at 866. As the government concedes, there is no per se rule that a civilian constructively consents to search upon request as a condition of entry to a military base that is not generally open to the public. Morgan, 323 F.3d at 782 (holding that there is no "categorical exception . . . for all searches on closed military bases").

In support of its argument that Mr. Hitselberger implicitly consented to the search of his backpack as a condition of his entry onto NSA Bahrain, the government points to the signs posted at the entrances to the naval base, and to the fact that NSA Bahrain was a closed, fortified installation in a foreign country.

Other courts have held that the posting of signs or other means of notification can help to establish implicit consent to search. In one such case, a sign posted at the base entrance read, "While on this installation all personnel and the property under their control are subject to search." Jenkins, 986 F.2d at 77; see also United States v. Vaughn, 475 F.2d 1262, 1264 (10th Cir. 1973) (per curiam) (concluding that, given an identical sign, "a search conducted without

probable cause and without consent could be proper" after entry). In another, a civilian received and displayed on his dashboard a visitor's pass that said, "Acceptance of this pass gives your consent to search this vehicle while . . . aboard . . . this station." Ellis, 547 F.2d at 865 n.1. In both cases, the language made clear that consent to search extended for the duration of the individual's time on the base: that is, "while" he remained "on this installation," Jenkins, 986 F.2d at 77, or "aboard . . . this station," Ellis, 547 F.2d at 865 n.1.

The signs posted outside of NSA Bahrain simply declared that "Authorized entry onto this installation constitutes consent to search of personnel and the property under their control." The government urges that this phrase should be understood to mean that entry constituted consent to search so long as one remained on NSA Bahrain, but unlike the signs discussed above, the signs at issue here did not say that in so many words. Neither did they simply say what Mr. Hitselberger suggests: that everyone was subject to search as they entered the naval base.

The government suggests that any ambiguity in the sign's language can be clarified, at least in part, by reference to the base on which the sign was posted: a fortified installation in a foreign land, and not generally open to visitors. Some cases have suggested that entry onto a closed base implies consent to search while aboard it. One district court, although evaluating a search conducted on an open base, said that "the present state of the law, at least inferentially, is that the open or closed character of [a] base is a pertinent factor in determining the reasonableness of a search," and commented that if the defendants before it "[h]ad . . . been discovered on a closed military installation," it "would have [had] no hesitation sustaining the search and seizure whether or not probable cause existed." United States v. Burrow, 396 F. Supp. 890, 900, 903 (D. Md. 1975). Reviewing a search that it found to be justified by exigent circumstances, the Eighth Circuit commented that "because the search occurred on . . . a closed

military base, there is even less reason to question the propriety of the search." United States v. Rogers, 549 F.2d 490, 493–94 (8th Cir. 1976). The Fourth Circuit came close to announcing a rule that "searches on closed military bases" are "exempt from the usual Fourth Amendment requirement of probable cause." Jenkins, 986 F.2d at 78. But the "basis of the Jenkins court's ruling was" "unclear," United States v. Deason, 2008 WL 954156, at *3 (M.D. Ga. Apr. 8, 2008)—the court also discussed the sign posted at the gate and seemed to inquire as to whether consent could be fairly inferred, Jenkins, 986 F.2d at 79. The Ninth Circuit has explicitly rejected a per se rule. Morgan, 323 F.3d at 782 (holding that there is no "categorical exception . . . for all searches on closed military bases"). And, as noted above, the government does not argue for one here, but merely asks that the nature of the base be considered in evaluating the totality of the circumstances.

One other circumstance bears some emphasis: Mr. Hitselberger was not merely a visitor to NSA Bahrain. He lived and worked there, and was presumably aware of the actual practice of searches and inspections on the base. None of the civilians in the cases discussed above had any official role on the military base. They were simply visitors. See Jenkins, 986 F.2d at 77 (estranged husband of servicemember); Ellis, 547 F.2d at 865 (civilian visitor). Because Mr. Hitselberger lived and worked on the naval base, his experience of its search procedures would reasonably have informed his understanding of what searches he had consented to by choosing to remain there. Testimony at the evidentiary hearing did not suggest that bags were typically searched after entry onto the base.

The questions of whether Mr. Hitselberger had a reasonable expectation of privacy in the contents of his backpack and, if so, whether he implicitly consented to the search of that bag by choosing to live on NSA Bahrain are difficult. The court will therefore set them aside and turn

13

to the government's alternative argument: that even if Mr. Hitselberger enjoyed a reasonable expectation of privacy and did not consent to the warrantless search, exigent circumstances made it permissible.

"[T]he 'Supreme Court has consistently held that a warrantless search . . . does not violate the fourth amendment when exigent circumstances exist.'" United States v. Goree, 365 F.3d 1086, 1089 (D.C. Cir. 2004) (quoting United States v. Mason, 966 F.2d 1488, 1492 (D.C. Cir. 1992)). "Because the possible factual permutations are almost endless, courts have not spelled out a definition of 'exigency' with any precision." United States v. Dawkins, 17 F.3d 399, 405 (D.C. Cir. 1994). But the D.C. Circuit "has said that, at bottom, '[t]he test for exigent circumstances is whether police had an urgent need or an immediate major crisis in the performance of duty afford[ing] neither time nor opportunity to apply to a magistrate.'" In re Sealed Case 96-3167, 153 F.3d 759, 766 (D.C. Cir. 1998) (quoting United States v. (James) Johnson, 802 F.2d 1459, 1461 (D.C. Cir. 1986)). "'The police . . . bear a heavy burden in attempting to demonstrate an urgent need that might justify warrantless searches.'" Goree, 365 F.3d at 1089 (quoting Welsh v. Wisconsin, 466 U.S. 740, 749–50 (1984)).

"The 'question of whether there were "exigent circumstances" is judged according to the totality of the circumstances,' and the standard 'is an objective one, focusing on what a reasonable, experienced police officer would believe.'" Id. at 1090 (quoting In re Sealed Case, 153 F.3d at 766 (internal quotation marks and citations omitted in Goree)); accord United States v. Socey, 846 F.2d 1439, 1446–47 (D.C. Cir. 1988). "Finally, in addition to the requirement that 'the police have a reasonable belief in the existence of the exigency,' the subsequent search must be 'no broader than necessary.'" Id. (quoting Mason, 966 F.2d at 1492). "Courts adjudicating the lawfulness of a search under this exception weigh the degree of intrusion against the

exigency that is its rationale." Id.; accord United States v. Lopez, 989 F.2d 24, 27 (1st Cir. 1993) (explaining that "because the degree of intrusion has a bearing on the reasonableness of the police action . . . . the extent of the intrusion, and the proportionality of response to need, inform the constitutional judgment"); Socey, 846 F.2d at 1448 (emphasizing "that the warrantless entry was limited in scope and proportionate to the exigency excusing the warrant requirement"). "As the Court said in Mincey, 'a warrantless search must be strictly circumscribed by the exigencies which justify its initiation.'" Goree, 365 F.3d at 1090 (quoting Mincey v. Arizona, 437 U.S. 385, 393 (1978)).

The government argues that there was an urgent need for Master Sergeant Holden to recover the classified documents that he had seen Mr. Hitselberger print, because the improper dissemination of classified information can put lives at risk. Master Sergeant Holden testified that Mr Hitselberger could not have disposed of the documents in the brief intervals when he was out of view. Tr. 70:16–23. But, as the government argues, it was impossible for him to be certain that Mr. Hitselberger still had the documents in his possession. There was room for some doubt, however slight, as to the location of the documents. And so the strength of that doubt and the significant consequences that could flow from wrongly assuming that the documents were still in the bag must be weighed against the intrusion into Mr. Hitselberger's privacy. That intrusion was quite small. Mr. Hitselberger's bag was never physically searched. The documents that he was made to hand over were not personal: though Mr. Hitselberger may have had a reasonable expectation of privacy in the contents of his backpack, he had no privacy interest in the contents of the official reports. Were it not for the fact that (as the government admits) Captain Hering saw into the backpack after Mr. Hitselberger was ordered to unzip it, the court would pause to question whether a search had actually occurred. As it is, "weigh[ing] the

degree of intrusion against the exigency that is its rationale," Goree, 365 F.3d at 1090, the court

concludes that the vanishingly small intrusion into Mr. Hitselberger's backpack was justified by

the almost equally small—but nonetheless dangerous—possibility that Mr. Hitselberger had

disposed of the classified documents in the moments when he was out of sight. "Given the

circumstances" that Master Sergeant Holden "confronted as well as the limited scope of the

search," the court "cannot conclude that the search was unreasonable under the fourth

amendment." Mason, 966 F.2d at 1492. The motion to suppress the evidence seized from Mr.

Hitselberger's backpack will be denied.

## B. Motion to Suppress Document Seized from Quarters

Mr. Hitselberger next argues that the document seized in the search of his quarters should

be suppressed, because (he says) the command authorization for search and seizure did not

satisfy the Fourth Amendment's warrant requirement. In the affidavit supporting the

authorization to search Mr. Hitselberger's quarters, Special Agent Kesici explained that he had

reviewed:

> signed sworn statements from Master Sergeant Michael A. HOLDEN, Captain
> Brendan G. HERING, [and] Master Sergeant Dal[e] C[H]RISTENSEN who
> observed Mr. James Francis Hitselberger, while at his place of work, physically
> take classified documents from a classified printer and place [them] into his
> personal backpack. Mr. Hitselberger was then observed walking out of the office
> carrying his backpack and the classified document[s] that he had just placed in it.
> Mr. Hitselberger was followed out of the building and asked about the contents of
> his backpack while outside, as he was walking away from the building. . . . [T]he
> contents of his backpack . . . disclosed multiple documents that were classified as
> Secret and Secret No Foreign.

Gov't Ex. 13, at 1. From these events, Special Agent Kesici concluded that it was "probable that

the classified material and/or documents found in Mr. Hitselberger['s] backpack was

intentionally searched, printed and subsequently removed from his classified workspace for

unknown reasons." Id. He noted that Mr. Hitselberger's residence was "located in close

16

proximity to [his] work location and [the] subsequent origin of classified material." *Id.* The affidavit was not signed.

In the command authorization for search and seizure that he signed, Captain Walsh found that there was "reason to believe that on the . . . premises known as: Navy [G]ateway Inn and Suites, Building S317B, [R]oom 317B . . . there is now being concealed certain property, namely. . . [c]lassified information to include hard copy documents, electronic computer storage media data files, to include text and graphical image files, contained on the digital storage media attached to or accompanying seizure equipment (such as but not limited to computer or other devices) for investigative purposes." *Id.* at 3. Captain Walsh declared himself to be "satisfied that there is probable cause to believe that the property so described is being concealed on the . . . premises above described and that grounds for application for issuance of a command authorized search exist as stated in the supporting affidavit." *Id.*

Mr. Hitselberger identifies several potential infirmities with this authorization: the lack of an oath or affirmation, the misidentification of Mr. Hitselberger's address, and the alleged absence of probable cause.

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. A warrant can only be issued by a "neutral and detached magistrate," *Johnson v. United States*, 333 U.S. 10, 14 (1948), and "[t]he information necessary to show probable cause must be contained within a written affidavit given under oath." *United States v. Perez*, 484 F.3d 735, 740 (5th Cir. 2007); *accord United States v. Falso*, 544 F.3d 110, 122 (2d Cir. 2008) (Sotomayor, J.) (citing with approval *United States v. Gourde*, 440 F.3d 1065, 1067 (9th Cir. 2006)).

17

"In military law, . . . there is no provision for the issuance of a warrant to search." *United States v. Stuckey*, 10 M.J. 347, 357 (1981). "Power to authorize a search is within the province of the commanding officer" who, although "he issues no warrants" can authorize a search upon "probable cause to believe that the things to be seized are on or within the premises to be searched." *Id.*

A command authorization for search and seizure is not a warrant, and many requirements of the warrant clause do not apply to such authorizations. *See, e.g.*, *Stuckey*, 10 M.J. at 360 ("[A] commander's authorization of a search has never been equated with the judicial-type procedure which comes within the contemplation of the warrant clause of the Fourth Amendment."). The question, then, is whether an authorization to search the person or property of a civilian on a military installation must comply with the formal requirements that apply to a civilian warrant, or with those that apply to a military search authorization, or to some combination or middle ground between the two. Some formal requirements for a warrant are clearly impracticable on a military base. No magistrate is available, nor anyone who is "neutral and detached" within the civilian understanding of that phrase. But the requirement of an oath or affirmation is not similarly impracticable—to the contrary, "it appears to be the preferred practice" that "the person presenting the information be under oath." *Chapman*, 954 F.2d at 1369.

Nonetheless, courts have approved searches of civilian property on military bases unsupported by oath or affirmation. *See United States v. Burrow,* 396 F. Supp. 890, 898 (D. Md. 1975) (upholding "a warrantless search [of a civilian], authorized on the basis of probable cause unsupported by oath or affirmation" "because of the unique status of military installations"); *United States v. Rogers*, 388 F. Supp. 298, 304 (E.D. Va. 1975) (concluding, after "[w]eighing all of the considerations involved in this extremely close question" that "the military procedure

18

was adequate to protect [a civilian] from an unreasonable search and seizure" even though "military procedure does not require that an oath or affirmation be given").  In doing so, they have distinguished between the "substantive rights guaranteed by the Fourth Amendment" and "the procedural formalities that are imposed upon civilian law enforcement agencies," holding that civilians on military property maintain their substantive rights, but cannot expect the military to follow every procedural formality that obtains in civilian life.  *Rogers,* 388 F. Supp. at 301. That conclusion is sound, and it suggests that military search procedures will generally apply to civilians on military property, because those procedures enforce "the Fourth Amendment's basic protection against unreasonable searches and seizures," *Chapman*, 954 F.2d at 1367, on the understanding that "the Fourth Amendment to the Constitution applies to servicemembers" as well as civilians, *United States v. Muniz*, 23 M.J. 201, 204 (1987).  If that were not the general rule, then military investigators would need to maintain a separate procedure for searches of civilians and their property.  This court will not impose such a requirement.

Mr. Hitselberger also objects to the adequacy of the descriptions contained in the command authorization.  The command authorization misidentified the address of the facility in which Mr. Hitselberger resided, but it included the proper name—the Navy Gateway Inn—and there was only one Navy Gateway Inn on the base.  Tr. 115:17–20; 116:4–6; 208:23–25; *United States v. Vaughn*, 830 F.2d 1185, 1186 (D.C. Cir. 1987) ("Under the Fourth Amendment a search warrant sufficiently describes the place to be searched if the officer with a search warrant can, with reasonable effort ascertain and identify the place intended." (internal quotation marks omitted)); *see also United States v. Watts*, 352 Fed. Appx. 784, 785 (4th Cir. 2009) ("[E]ven where a warrant contains a technical inaccuracy, a sufficient description of the premises, especially where the executing officer had knowledge of the particular place to be searched, will

meet the Fourth Amendment's particularity requirement." (footnote omitted)). As for probable cause, the command authorization said, in essence, that Mr. Hitselberger had been observed carrying classified documents out of a secure area and towards his living quarters, which is surely enough to provide probable cause for a search of those quarters. *See e.g.*, *Terry v. Ohio*, 392 U.S. 1, 30 (1968) (finding probable cause for a stop and search when a "police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot"); *United States v. Davis*, 458 F.2d 819, 821–22 (D.C. Cir. 1972) (finding probable cause when police officer witnessed elements of a drug trafficking crime, including a potential exchange of money). His motion to suppress the document seized in that search will be denied.

### C. Motion to Dismiss Counts Alleging Violations of 18 U.S.C. § 2071

Mr. Hitselberger has been charged with three violations of 18 U.S.C. § 2071(a), which provides that:

> Whoever willfully and unlawfully conceals, removes, mutilates, obliterates, or destroys, or attempts to do so, or, with intent to do so takes and carries away any record, proceeding, map, book, paper, document, or other thing, filed or deposited with any clerk or officer of any court of the United States, or in any public office, or with any judicial or public officer of the United States, shall be fined under this title or imprisoned not more than three years, or both.

Mr. Hitselberger has moved to dismiss these charges under Federal Rule of Criminal Procedure 12(b), which allows a party to "'raise by pretrial motion any defense, objection, or request that the court can determine without a trial of the general issue.'" *United States v. Yakou*, 428 F.3d 241, 246 (D.C. Cir 2005) (quoting Fed. R. Crim. P. 12(b)). Mr. Hitselberger requests that the court determine the scope of 18 U.S.C. § 2071(a), and then rule that his alleged conduct did not violate it. The court can grant the first request "without a trial of the general issue," but cannot grant the second—at least, it cannot grant the second in the present procedural posture.

The leading case on the scope of 18 U.S.C. § 2071(a) is *United States v. Lang*, 364 F.3d 1210 (10th Cir. 2004), *vacated on other grounds* 543 U.S. 1108 (2005), *reinstated in relevant part* 405 F.3d 1060, 1061 (10th Cir. 2005). As relevant here, *Lang* involved a woman who was convicted of "unlawfully removing a document from a federal clerk's office in violation of 18 U.S.C. § 2071(a)." *Id.* at 1212. Mrs. Lang "copied and took home a sealed affidavit. . . . read the document, which authorized police to use a tracking device in a narcotics investigation, and discussed its contents with . . . her husband." *Id.* She called one of the suspects in the investigation and discussed the affidavit with him and an associate of his. When Mrs. Lang was interviewed by federal agents, she "admitted that she had taken a copy of the affidavit home and discussed it with her husband." *Id.* at 1213. A jury convicted her under 18 U.S.C. § 2071(a), and she appealed. *Id.*

The appellate panel split on the question of whether Mrs. Lang's conduct in fact violated 18 U.S.C. § 2071(a). The majority held that it did, reaching its "conclusion after determining that *a copy* of an officially filed document falls within the statutory language" of 18 U.S.C. § 2071(a). *Lang*, 364 F.3d at 1221. The majority acknowledged that Congress did not mention copies of documents or records in 18 U.S.C. § 2071(a), that it had explicitly included document copies in other criminal statutes—and that it therefore might be thought to have implicitly excluded copies from the statute at issue here. *See id.* (citing 18 U.S.C. § 793(b)). But the majority cautioned that "courts have [nonetheless] interpreted statutes with similar language to § 2071 to cover copies despite the omission of the word 'copies' from the statute," *id.*, citing *United States v. DiGilio*, 538 F.2d 972 (3d Cir. 1976), as an example. In *DiGilio*, the Third Circuit held that under 18 U.S.C. § 641, which prohibits the conversion to one's own "use or the use of another . . . any record . . . or thing of value of the United States," 18 U.S.C. § 641, an

21

employee who copies a record on government equipment without authorization has created another record for purposes of the statute. *DiGilio*, 538 F.2d at 977. The *Lang* majority reasoned that "a finding that copies of government records are themselves records under 18 U.S.C. § 641 applies equally under 18 U.S.C. § 2071(a)" because "both statutes employ strikingly similar language" and "neither statute discusses copies of government documents or defines the term 'record' in this context." *Lang*, 364 F.3d at 1221 n.6. The majority therefore held "that a copy of a government record itself functions as a record for purposes of § 2071." *Id.* at 1222. It went on to conclude (without explanation) that "the copy of a *filed* and *deposited* government record is itself a *filed* and *deposited* government record" within the meaning of 18 U.S.C. § 2071(a). *Id.* Because the majority found "that (1) the copy of the affidavit itself is considered a government record, and (2) the affidavit had been filed and deposited in the clerk's office," it ruled that "Mrs. Lang's theft of the affidavit copy violates § 2071." *Id.*

The third judge on the *Lang* panel dissented, concluding that the majority's analysis was incorrect and its reliance on *DiGiglio* misplaced, because "Section 2071 and § 641 were designed to deal with entirely different evils." *Id.* at 1225 (Murphy, J., dissenting). He explained that "Section 2071 is one of six provisions set out in chapter 101 of title 18," and that (in his view) "[e]ach of the six provisions . . . relates to either (1) the concealment, removal, mutilation, or falsification of government records or reports, or (2) the failure by government officials to file reports as required by law." *Id.* at 1225 (Murphy, J., dissenting) (citing 18 U.S.C. §§ 2071 to 2076). Section 641, by contrast, "is set out in [a] chapter [that]. . . . prohibits numerous kinds of thefts and embezzlements, including both public and nonpublic monies, documents, and records." *Id.* Relying heavily on the analysis of *United States v. Rosner*, 352 F. Supp 915 (S.D.N.Y. 1972), the *Lang* dissent concluded that "[i]t is clear from the plain language

of § 2071, and its placement in chapter 101 with other provisions relating to the accuracy of the record of government affairs, that § 2071 was designed for the narrow purpose of *criminalizing the obliteration of information* from the record of public affairs." *Lang*, 364 F.3d at 1225 (Murphy, J., dissenting) (emphasis added).

The district judge in *Rosner* undertook "an extensive historical analysis of § 2071 and its predecessors." *Lang*, 364 F.3d at 1225 (Murphy, J., dissenting) (discussing *Rosner*, 352 F. Supp. at 919–21). In the words of the *Rosner* court:

> [The] purpose [of § 2071] is to prevent any conduct which deprives the Government of the use of its documents, be it by concealment, destruction, or removal.... Despite its antiquity, legislative history is almost wholly lacking. It has been, however, the subject of careful analysis by a District Judge for the Eastern District of Michigan.... In speaking of Section 2071(a)'s predecessor[,] ... that Court said:
>
> > [ ]It is manifest that this statute is not broad enough, and was not intended to punish the mere larceny or theft of the papers or documents as property, but that the essential element of the offense is the specific intent to destroy them as records of a public office; or, in other words, to obliterate or conceal them as evidence of that which constitutes their value as public records, or to destroy or impair their legal effect or usefulness as a record of our governmental affairs, be that effect or usefulness what it may.[ ]

*Rosner*, 352 F. Supp. at 919. The *Rosner* court noted that the First and Eighth Circuits had reached a similar conclusion about the predecessor to Section 2071. *See Martin v. United States*, 168 F. 198, 203 (8th Cir. 1909) (holding that predecessor was not intended to criminalize a removal "which in no way interferes with the lawful use of the record or document in its proper place"); *McInerney v. United States*, 143 F. 729, 731 (1st Cir. 1906) (holding that purpose of predecessor statute was "to preserve [papers, documents, and files] as evidence relating to things which concern the public and the government").

*DeGroat*, *McInerney*, and *Martin* each "recognized . . . that the predecessors of Section 2071 were not larceny statutes." *Rosner*, 352 F. Supp. at 920. It explained that "Section 2071 has not been used to prosecute larceny" but "has instead been customarily employed where Government records have been mutilated or destroyed." *Id.* at 921. *Rosner* was decided at the height of the Vietnam War, when the records allegedly destroyed in prosecutions brought under Section 2071 were "frequently . . . Selective Service System files." *Id.* Of course, Section 2071 was not limited to the destruction of government records; it had "also been used to prosecute the removal" of such records. *Id.* In those prosecutions, "[t]he essence of the offense charged . . . has not been larceny, for which Section 641 was available, but the rendering of information unavailable to the Government." *Id.*

The *Lang* dissent found "[t]he *Rosner* court's thorough and well-supported analysis . . . persuasive" and its "decision that § 2071 is violated only by the obliteration of information from the record of government affairs . . . fully supported by the plain language of § 2071 and the placement of § 2071 in chapter 101 with other provisions relating to the accuracy of the record of governmental affairs." *Lang*, 364 F.3d at 1227 (Murphy, J., dissenting). This court agrees, for the reasons set forth in *Rosner* and the *Lang* dissent. *Accord United States v. Poindexter*, 725 F. Supp. 13, 20 (D.D.C. 1989) (commenting that "[t]he obvious purpose of [18 U.S.C. § 2071] is to prohibit the impairment of sensitive government documents"). To convict Mr. Hitselberger of violating 18 U.S.C. § 2071(a), the government will need to prove that he obliterated information from the public record.

The court can easily determine as much "without a trial of the general issue"—that is, without considering "evidence relevant to the question of guilt or innocence." *Yakou*, 428 F.3d at 246 (quoting *United States v. Ayarza–Garcia,* 819 F.2d 1043, 1048 (11th Cir. 1987)). But Mr.

Hitselberger requests more: he seeks the dismissal of the counts charging him with violations of 18 U.S.C. § 2071(a), on the grounds that he did not in fact obliterate information from the public record.

"There is no federal criminal procedural mechanism that resembles a motion for summary judgment in the civil context." *Yakou*, 428 F.3d at 246. But even though "Rule 12(b) does not explicitly authorize the pretrial dismissal of an indictment on sufficiency-of-the-evidence grounds," the D.C. Circuit has held that where "the existence of undisputed facts obviate[s] the need for the district court to make factual determinations properly reserved for a jury," the district court may dismiss an indictment before trial "based on a question of law where the government has not made a timely objection." *Yakou*, 428 F.3d at 246–47. One judge in this district has further held that the government cannot prevent a pretrial dismissal simply by raising a timely objection, so long as the relevant facts are undisputed and only a question of law is presented. *United States v. Nitschke*, 843 F. Supp. 2d 4, 8–9 (D.D.C. 2011). But the Circuit has emphasized that "it is an 'unusual circumstance[ ]' for the district court to resolve the sufficiency of the evidence before trial because the government is usually entitled to present its evidence at trial and have its sufficiency tested by a motion for acquittal under Rule 29 of the Federal Rules of Criminal Procedure." *Yakou*, 428 F.3d at 247 (quoting *Risk v. United States,* 843 F.2d 1059,1061 (7th Cir. 1988)); *see also United States v. Naegele*, 367 B.R. 1, 14 (D.D.C. 2007) ("Only in 'unusual circumstance[s]' is pretrial dismissal of the indictment possible on sufficiency-of-the-evidence grounds, and that is 'where there are material facts that are undisputed and only an issue of law is presented.'") (quoting *Yakou*, 428 F.3d at 247).

Mr. Hitselberger has offered (for the limited purposes of this motion) to stipulate to any version of the facts that the government wishes, but the government has refused the offer. There

are therefore no undisputed facts in this case, and the government vigorously objects to Mr. Hitselberger's request that the court consider the sufficiency of the evidence against him. Even if the court were to adopt the holding of *Nitschke* (and the suggestion of *Naegele*) that a government objection does not bar a ruling on the sufficiency of the evidence, the absence of an undisputed record or stipulated facts would still present a substantial impediment. It is usually "improper to force the Government . . . to proffer its evidence pretrial so that the defense might test its sufficiency. That could, for instance, curtail the Government's ability to obtain additional evidence or locate new witnesses." *Nitschke*, 843 F. Supp. 2d at 9.

Although the court cannot—or, at the very least, usually should not—force the government to put its case forward before trial, testimony at the evidentiary hearing and the government's representations in its briefs suggest that the documents at issue in Counts Four, Five, and Six were official reports that were emailed to Mr. Hitselberger. The superseding indictment alleges that, on three separate occasions, Mr. Hitselberger "willfully and unlawfully removed, took, and carried away papers and documents . . . that were filed and deposited in a public office" —specifically "a Joint Special Operations Task Force . . . Situation Report . . . dated April 11, 2012 . . . and a Navy Central Command . . . Regional Analysis dated April 9, 2012," Count 4, "a Joint Special Operations Task Force . . . Situation Report . . . dated March 8, 2012," Count 5, and "a Bahrain Situation Update dated February 13, 2012," Count 6. The government has represented that its evidence at trial "would show that the U.S. military creates these reports in electronic format on a secure, classified computer network and maintains them on the network. The principal means for persons who are authorized to see these reports to access them is through this network." Govt's Opp'n to Def's Mot. to Dismiss Counts Four, Five, and Six, at 2, May 10, 2013, ECF No. 61. If these are the factual allegations that the government intends to prove at trial, it is difficult to see how the government could prove that Mr. Hitselberger obliterated information from the public

record in violation of 18 U.S.C. § 2071(a) by printing electronically stored documents and then taking the print-outs. Moreover, the court presumes that the government obtained the indictment against Mr. Hitselberger on the understanding that the majority opinion in *Lang* was good law, and that it would only need to prove that Mr. Hitselberger "removed" the documents at issue in the sense of intentionally walking off with them (which the government suggests that it can prove) rather than the sense of erasing them from the public record. But without any undisputed facts, the court cannot rule as a matter of law that Mr. Hitselberger did not violate 18 U.S.C. § 2071(a). *See Yakou*, 428 F.3d at 246–47. The court will therefore deny Mr. Hitselberger's motion to dismiss the charges brought under that statute. The court repeats that it has a facially valid indictment and no facts before it. If the government believes that it can convict Mr. Hitselberger of obliterating information from the public record in violation of 18 U.S.C. § 2071(a), it is entitled to proceed to trial on those charges.

### D. Motion to Admit Evidence of Other Acts

The government has moved to admit evidence under Federal Rule of Evidence 404(b), which provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Although this sentence is "'framed restrictively,' the rule itself 'is quite permissive,' prohibiting the admission of other crimes evidence 'in but one circumstance'—for the purpose of proving that a person's actions conformed to his character." *United States v. Crowder*, 141 F.3d 1202, 1206 (D.C. Cir. 1998) (en banc) (quoting *United States v. Jenkins*, 928 F.2d 1175, 1180 (D.C. Cir. 1991)); *see also United States v. Bowie*, 232 F.3d 923, 930 (D.C. Cir. 2000) ("The rule does not prohibit character evidence generally, only that which lacks any purpose but proving character.").

The D.C. Circuit has often said that "Rule 404(b) is a rule of inclusion rather than exclusion." *Bowie*, 232 F.3d at 929. "A proper analysis" under that rule therefore "begins with the question of relevance: is the other crime or act relevant and, if so, relevant to something other than the defendant's character or propensity? If yes, the evidence is admissible unless excluded under other rules of evidence such as Rule 403." *Id.* at 930 Rule 403, in turn, allows a court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury," among other concerns. Fed. R. Evid. 403. When Rule 403 is invoked, "the concern about 'prejudice' is focused on the danger of the jury using the other crimes evidence in a way the rules do not permit—to conclude that because the defendant committed some other crime [or act], he must have committed the one charged in the indictment. This danger, of course, will be present in every Rule 404(b) case. But that alone cannot give rise to a *per se* rule of exclusion . . . ." *Crowder*, 141 F.3d at 1210. Instead, district courts are empowered to make a "discretionary judgment"---that is, an "assessment, not of relevance, but of the evidentiary value of the government's Rule 404(b) evidence." *Id.* "In other words, the Court must assess the. . . probative value . . . of the evidence . . . as compared to the risk of unfair prejudice," confusing the issues, or misleading the jury. *United States v. Larrahondo*, 885 F. Supp. 2d 209, 227 (D.D.C. 2012).

The government seeks to introduce evidence for two purposes unrelated to Mr. Hitselberger's character. First, it claims that correspondence between Mr. Hitselberger and the Hoover Institution will establish that he had an ongoing relationship with the Institution and often contributed materials to be archived there. The government argues that this is relevant because it will need to demonstrate that Mr. Hitselberger mailed the document at issue in Counts Three and Six to the Hoover Institution, and evidence that he had previously sent materials there

will support its case. To establish the relationship between Mr. Hitselberger and the Hoover Institution, the government would introduce three[4] postmarked envelopes that appear to have been mailed by Mr. Hitselberger, Gov't Mot., Ex. 2 at 1–3, and email correspondence[5] between the Institution and Mr. Hitselberger, *id.*, Ex. 5. At oral argument, Mr. Hitselberger withdrew his 404(b) objections to the introduction of this evidence (while preserving other objections until trial) to the extent that it does not discuss classified materials. Arg. Tr. 110:21–111:1 (envelopes); Arg. Tr. 113:17–20 (email correspondence). Having reviewed the documents in question, the court finds that they do not discuss classified materials; they will therefore be admissible under Rule 404(b) so long as they satisfy the normal evidentiary requirements.

Mr. Hitselberger also withdrew his 404(b) objection (while again preserving all other objections) to the introduction of three paragraphs from a statement that he made in 2005 regarding the handling of sensitive materials in Iraq. Arg. Tr. 130:16–131:23; Gov't Mot., Ex. 6 at 3, paras. 1–3. The government in turn withdrew its motion to admit the remainder of the document and agreed to redact the paragraphs in question to eliminate any suggestion that Mr. Hitselberger was under investigation in 2005. Arg. Tr. 123:11–12, 125:7–8. The three paragraphs in question will therefore be admissible under Rule 404(b) so long as they satisfy the normal evidentiary requirements.

The government offers those paragraphs for a second purpose unrelated to Mr. Hitselberger's character: to show that he was familiar with and knowledgeable about classification markings and the proper handling of sensitive material. This is relevant, the

---

[4] The government intends to introduce other envelopes, originally put forward as 404(b) evidence, as direct evidence at trial. *See* Arg. Tr. 94:18–24, 102:9–15.

[5] The government intends to introduce additional correspondence as direct evidence at trial. Arg. Tr. 95:15–19, 103:4–10.

government appears to argue, because (1) the counts brought under 18 U.S.C. § 793 will require it to prove the Mr. Hitselberger willfully retained national defense information, (2) the alleged national defense information was contained in documents marked classified, and so (3) Mr. Hitselberger's knowledge of classification markings and procedures would suggest that he knew the documents at issue in this case were required to be maintained securely, which (4) supports the government's case that he willfully (and not, say, accidentally) retained the documents.  On this basis, the government would admit (1) a letter dated July 8, 2005 from Mr. Hitselberger to the Hoover Institution, in which Mr. Hitselberger discusses three intelligence reports apparently enclosed with the letter, Gov't Mot., Ex. 1 at 1, and (2) three reports marked classified that were discovered in Mr. Hitselberger's collection at the Hoover Institution, one of which was discussed in the July 8 letter, Gov't Mot., Exhs. 3–4.  The government does not intend to prove that the reports contained national defense information, nor that they were actually and properly classified at the time Mr. Hitselberger allegedly sent them to the Hoover Institution.  Said differently, the government does not intend to argue that Mr. Hitselberger previously retained national defense information, nor that he mishandled classified information.  Instead, it would introduce evidence that suggests as much for the sole purpose of demonstrating that Mr. Hitselberger was familiar with and knowledgeable about classification markings and the proper handling of sensitive materials.

Mr. Hitselberger objects that even if this were a relevant purpose—which he vigorously disputes—the evidence is overwhelmingly and unfairly prejudicial.  *See* Fed. R. Evid. 403.  The court turns first to the July 8, 2005 letter, in which Mr. Hitselberger writes:

> I am enclosing three intelligence reports for your archives.  These are all from Fallujah.  I was at the main check point for entering Fallujah and in the compound there is a box containing reprints of A[m]erican news reports about Iraq.  For some reason or other, someone put these intelligence reports inside along with the

newspaper articles. Two of the reports have no classification and the third is classified as "secret." It states that it will be declassified on 20150323. Could that mean ten years from the date it might be issued? That is, March 23, 2015?

Regardless of the case, this material seems to warrant archival preservation. I will leave the matter up to you to determine when researchers can have access to these items, as I am fully confident that your institution balances national security concerns with the need of researchers for original source material.

In this letter, Mr. Hitselberger represents himself as somewhat knowledgeable about classification markings—he recognizes a "Secret" designation, but only purports to guess at the document's declassification date—and somewhat indifferent about the classified nature of the material that he was passing along. He sends the apparently classified intelligence report to the Hoover Institution even though he does not understand how it got mixed up with American news reports—"[f]or some reason or other," it did—and "[r]egardless of" the fact that it may not be declassified for another decade. The letter leaves a strong impression that Mr. Hitselberger was careless or cavalier in his handling of classified documents. But the government does not intend to prove that Mr. Hitselberger mishandled the report he describes, nor that it was actually classified. It avers that its only interest in the letter and the accompanying report is that the report appears to be classified, and Mr. Hitselberger appears to recognize it as such. Even if Mr. Hitselberger's ability to recognize classification markings were relevant to the government's case—which the court assumes without deciding—the clear suggestion that Mr. Hitselberger previously mishandled classified information (which Mr. Hitselberger will not be able to rebut, because the government will not allege any wrongdoing) is highly prejudicial and, because it would remain unstated, would very likely confuse the issues before the jury. It would be one thing if the government intended to introduce evidence that Mr. Hitselberger had previously mishandled classified information in order to demonstrate that he willfully retained national defense information in this instance (though the slippage between "classified information" and

31

"national defense information" would still require careful thought). But to introduce evidence that suggests Mr. Hitselberger previously mishandled classified information in order to demonstrate only that he knew classified information when he saw it, would be confusing and unfairly prejudicial, placing a large burden on Mr. Hitselberger to rebut an accusation that the government would never quite make about events that took place almost nine years ago. No jury instruction could adequately address the potential for prejudice and confusion. The July 8 letter and apparently classified documents from 2005 will not be admitted under Rule 404(b).

Finally, the government seeks to introduce other letters from Mr. Hitselberger to the Hoover Institution. These letters (1) discuss and enclose a book by Sayyid Muqtada al-Sadr, who was leading an insurgency against American and Iraqi forces when the letter was sent, (2) discuss enclosed handbills, which Mr. Hitselberger suspects were produced by U.S. forces in psychological operations, and allude to other such documents that Mr. Hitselberger had sent earlier, (3) discuss and enclose additional documents, including a soldier's field book, and (4) discuss and enclose photographs from Iraq in 2004-05, including photographs of Iraqi translators. The government would offer this evidence for the same non-character purpose as the post-marked envelopes and the email correspondence between Mr. Hitselberger and the Hoover Institution: to establish that Mr. Hitselberger often mailed materials to the Institution, in support of its case that Mr. Hitselberger intentionally sent the document at issue in Counts Three and Six. That is a relevant purpose. But Mr. Hitselberger argues that the letters would be unfairly prejudicial because they could reflect poorly upon him: a juror could conclude that he was sympathetic to the Iraqi insurgency, or careless with materials produced by American psychological operations forces, or with a soldier's notes or images that could threaten the lives of Iraqi translators. Those are legitimate concerns, though some more legitimate than others—

and they could be allayed by redacting the documents or instructing the jury not to draw any negative inferences about the propriety of Mr. Hitselberger's behavior. The court will therefore defer ruling on the remainder of the government's motion until the parties have discussed whether they can reach an accommodation by which the letters would be redacted, selectively introduced, or coupled with a jury instruction that would satisfy both the government's desire to demonstrate that Mr. Hitselberger regularly sent material to the Hoover Institution and the defendant's concern that the jury not infer that there was anything improper in doing so, when the government does not offer the evidence on that basis.

## IV. CONCLUSION

For the reasons stated above, Mr. Hitselberger's motions to suppress evidence seized from his backpack and his quarters will be denied. His motion to dismiss the counts alleging violations of 18 U.S.C. § 2071(a) will also be denied. And the government's motion to introduce 404(b) evidence will be granted in part, denied in part, and partially held in abeyance.

Dated: March 5, 2014                                    RUDOLPH CONTRERAS
                                                        United States District Judge