# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Criminal Action No.: 12-CR-231 (RC) |
| | : | |
| JAMES HITSELBERGER, | : | Re Document No.:  42 |
| | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

### DENYING DEFENDANT'S MOTION TO SUPPRESS STATEMENTS

## I. INTRODUCTION

Defendant, Mr. Hitselberger, has been charged by the United States of America on three counts of violating 18 U.S.C. §793(e), for willfully removing and retaining documents relating to the national defense. He has also been charged on three counts of violating 18 U.S.C. §2071(a), for willfully and unlawfully removing public documents from their secured location. On three separate occasions, Mr. Hitselberger was interviewed by Naval Criminal Investigative Service ("NCIS") Agents. On the third occasion, Mr. Hitselberger was also interviewed by an agent from the Federal Bureau of Investigations. Mr. Hitselberger now moves to suppress statements made in these interviews as a violation of his Fifth Amendment right against self-incrimination and his Fourth Amendment right against unlawful searches and seizures.

## II. FACTUAL BACKGROUND

James Hitselberger is a 56-year-old linguist. Mr. Hitselberger attended Georgetown University, where he studied Arabic, and the University of Texas, where he worked towards a PhD in politics and government. Govt's Opp'n to Mot. to Suppress, Ex. 2, Results of Interview with Hitselberger, April 5, 2013, ECF No. 46. He is fluent in Arabic, Farsi, and Russian.  In June

2011, he was hired by Global Linguist Solutions, which assigned him to work for the United States Navy at a base in Bahrain. Mr. Hitselberger regularly worked with classified information. After being hired as a linguist, Mr. Hitselberger underwent training on the different types of classified information and the proper handling of such materials. Govt's Mem. in Supp. of Detention, 4, Dec. 12, 2012, ECF No. 13. The Government alleges that on April 11, 2012, two supervisors observed Mr. Hitselberger checking his email in a Restricted Access Area and then printing multiple pages clearly marked as SECRET from a SECRET printer. Compl. ¶¶12-13, Aug. 6, 2012, ECF No. 1. The Government contends that Mr. Hitselberger was observed taking the classified documents from the printer, placing them into an Arabic-English Dictionary, and attempting to leave the building with the SECRET documents. *Id.* at ¶12. Mr. Hitselberger was stopped by his supervisor and his commanding officer after exiting the building and was asked to produce the documents he just printed. *Id.* The documents recovered from Mr. Hitselberger's backpack were marked as SECRET in red, bold type in the header and footer of each page. Tr. of Mot. Hr'g, Morning Session, Sept. 6, 2013, 24–25. The documents contained the availability of improvised explosive devices in Bahrain, schedule for the monthly travel of a high-ranking commander in Bahrain and information about the locations of U.S armed forces in the region and their activities. Govt's Mem. in Supp. of Detention, 7, Ex. 7.

On April 11, 2012, NCIS Special Agents conducted a Command Authorized Search and Seizure of Mr. Hitselberger's living quarters in Bahrain. Compl. ¶14. Inside, Special Agents found documents classified as SECRET with the SECRET warning label cut off the top and bottom of the pages. Compl. ¶14. This document contained information about the location of U.S. forces and their undisclosed activities in the region. Govt's Mem. in Supp. of Detention, at 8, Exs. 10-11. The last document, located in the Hoover Institute's public library, was originally

classified as SECRET. Govt's Mem. in Supp. of Detention at 10-11, Ex. 13. This document discusses gaps in U.S. intelligence with respect to the political situation in Bahrain. *Id.* at 10-11, Ex. 14.

On April 11, 2012, Mr. Hitselberger was escorted to the Naval Security Force offices, where he was held for approximately eight hours. Tr. of Mot. Hr'g, Afternoon Session, 148 - 149, Sept. 6, 2013. During this time, he was guarded by Naval Security Force officers, until he was escorted to the NCIS offices for his interview. Tr. of Mot. Hr'g, 150. On the evening of April 11, 2012, NCIS special agents Raffi Kesici and John Fowler interviewed Mr. Hitselberger regarding the events earlier that day. Tr. of Mot. Hr'g, 120. The interview began at approximately 8:14 p.m. and Mr. Hitselberger signed a written waiver of his *Miranda* rights at 8:52 P.M. Tr. of Mot. Hr'g, 122-3; Govt. Ex. 11 (Interview Log Timeline). During the pre-*Miranda* conversation, Mr. Hitselberger made several statements about his relationship with his co-workers, his educational background and the collection he established at the Hoover Institution. Tr. of Mot. Hr'g, 121-4, 192. The agents did not ask Mr. Hitselberger any questions about the precipitating incident until after the *Miranda* warning was issued and the waiver was obtained. Tr. of Mot. Hr'g, 125. The interview occurred in a conversational and cordial tone. Tr. of Mot. Hr'g, 124.

After establishing a rapport with Mr. Hitselberger, Agents Fowler and Kesici administered *Miranda* warnings, reading verbatim from a pre-printed form. Tr. of Mot. Hr'g, 125; Govt. Ex. 10 ("Civilian Suspect's Acknowledgement and Waiver of Rights"). Mr. Hitselberger read the form, initialed each line next to the right he was waiving, and then signed his name at the bottom, under a section stating:

> I understand my rights as related to me and as set forth above. With that understanding, I have decided that I do not desire to remain silent, consult with a

> retained or appointed lawyer, or have a lawyer present at this time. I make this decision freely and voluntarily. No threats or promises have been made to me.

Govt. Ex. 10; Tr. of Mot. Hr'g, 126-7. After Mr. Hitselberger executed the waiver, Agents Fowler and Kesici began to ask questions about the incident they were investigating. Tr. of Mot. Hr'g, 127. The interview ended at approximately 11:25 p.m. *See* Govt. Ex. 11.

At approximately 10:30 p.m. Agents Fowler and Kesici asked whether Mr. Hitselberger would be willing to sign a written statement of the information already discussed in the interview. Tr. of Mot. Hr'g, 175. While Mr. Hitselberger seemed willing to provide a written statement, he requested an attorney to review the statement before it was signed. Tr. of Mot. Hr'g, 176; Govt. Ex. 10. Agent Kesici testified that Mr. Hitselberger "hesitated and said he's feel more comfortable consulting with a lawyer first or having a lawyer review his statement prior to providing it." Tr. of Mot. Hr'g, 176. At this point, the NCIS agents clarified that Mr. Hitselberger was requesting an attorney only to review his written statement, and not for the ongoing oral interview. Tr. of Mot. Hr'g, 176; Govt. Ex. 10. Mr. Hitselberger voluntarily arranged to come back the next morning at 10 a.m. to sign the written statement. Tr. of Mot. Hr'g, 177. At the end of the interview, Mr. Hitselberger was escorted to his temporary room, as his current room was still considered a crime scene. Tr. of Mot. Hr'g, 178.

The next day, April 12, 2012, Mr. Hitselberger returned to the NCIS offices between 10:00 or 11:00 a.m., past the time of his appointment. Tr. of Mot. Hr'g, 179. He explained to the agents that he was feeling tired and asked to return again at 3:00 p.m. Tr. of Mot. Hr'g, 179. When Mr. Hitselberger again missed his 3:00 p.m. appointment, two agents checked on his whereabouts and brought Mr. Hitselberger to the NCIS offices. Tr. of Mot. Hr'g, 180-1. The interview was conducted by Special Agents Fowler and Adlin Velez. Tr. of Mot. Hr'g, 228, 230. Agent Fowler explained to Agent Velez and Mr. Hitselberger that Mr. Hitselberger was there to

consider memorializing the previous night's interview into a written statement. Tr. of Mot. Hr'g, 232. Before proceeding to the written statement, Mr. Hitselberger was reminded of the *Miranda* waiver he signed the night before. Tr. of Mot. Hr'g, 233-4. Mr. Hitselberger reviewed the waiver and stated that he remembered the form, and his waiver. Tr. of Mot. Hr'g, 234. However, Mr. Hitselberger was still unwilling to proceed with a written statement without an attorney present. Tr. of Mot. Hr'g, 235.

No written statement was signed. However, Agent Velez clarified that Mr. Hitselberger's request for an attorney only applied to the written statement, and not to any oral conversation they may have. Tr. of Mot. Hr'g, 236. Mr. Hitselberger was then interviewed for approximately three to four hours. Tr. of Mot. Hr'g, 236. He was calm and conversational for the interview. Tr. of Mot. Hr'g, 237; Govt.'s Ex. 21. Mr. Hitselberger did not request an attorney at any time during that oral interview. Tr. of Mot. Hr'g, 240. Mr. Hitselberger was not arrested at that point. Tr. of Mot. Hr'g, 244. Instead, arrangements were made for him to leave the base. Tr. of Mot. Hr'g, 244. Govt's Det. Mem., 9, Dec. 12, 2012, ECF No. 13.

Mr. Hitselberger was arrested on October 24, 2012 and transported from Kuwait to Washington D.C. On October 25, 2012, Mr. Hitselberger had another interview with Special Agent Grant Cauthen of the Federal Bureau of Investigation ("FBI"). Tr. of Mot. Hr'g, 248. At the time of the interview, Mr. Hitselberger had been traveling for three days and had not received much sleep. Tr. of Mot. Hr'g, 270. Agent Cauthen testified that Mr. Hitselberger was coherent and calm throughout the interview, although he did seem tired. Tr. of Mot. Hr'g, 250; *See* Govt's Ex. 22. A video of the introductory portion of the interview indicates that Mr. Hitselberger was

composed and lucid, and that the questioning was in a conversational tone.[1] *See* Govt's Ex. 22. Agent Cauthen administered the *Miranda* warning at the outset of the interview. Tr. of Mot. Hr'g, 254. Agent Cauthen went through each section of the *Miranda* waiver form, explaining each right and ensuring that Mr. Hitselberger did not have any questions about the right. Tr. of Mot. Hr'g, 255. After each section of the form was explained, Mr. Hitselberger initialed in the left-hand margin, signifying his waiver of the right. Tr. of Mot. Hr'g, 255.

Mr. Hitselberger now argues that his statements were not voluntary and were obtained in violation of his Fifth Amendment right against self-incrimination and his Fourth Amendment right against unlawful searches and seizures. Specifically he would like to suppress the pre-*Miranda* statements made on April 11, 2012 and the post-*Miranda* statements made on April 12, 2012 and October 25, 2012. He additionally argues that the statements from the interviews should be suppressed as fruits of an unlawful search and seizure, as set forth in Mr. Hitselberger's Motion to Suppress Tangible Evidence Seized. Def.'s Mot. to Suppress Tangible Evidence, March 1, 2013, ECF No. 39.

### III. ANALYSIS

#### A. Legal Standard

At *Miranda's* core is a concern for oppressive interrogatory techniques that "overbear the will" of the suspect. *Miranda v. Arizona*, 384 U.S. 436, 469 (1966). The Supreme Court lays out several techniques that officers use to achieve this result, including trickery, an unrelenting interviewing without breaks, and the good cop/bad cop routine. *Id.* at 450-2. The Supreme Court does not think, however, that coercion can arise from general kindness and respect during an

---

[1] Mr. Hitselberger requested that the interview not be taped. Govt's Ex. 22. For this reason, only the initial introductory portion of the interview is captured on the video.

interview. If even kind and respectful behavior is considered coercive enough to "overbear the will," then what tools are left to enforcement officers to question a suspect? *Id.* at 478. After all, *Miranda* recognizes that "confessions remain a proper element in law enforcement. Any statement given freely and voluntarily *without any compelling influences* is, of course, admissible in evidence." *Id.* Since *Miranda,* the Supreme Court has held that non-coercive yet misleading ploys, intentionally employed by officers to lull a suspect into a false sense of security, comport with the Fifth Amendment's protections against self-incrimination. *See Illinois v. Perkins*, 496 U.S. 292, 297 (1990) (finding no *Miranda* violation where a suspect boasted of his criminal activities to a person whom he believed to be a cellmate but in fact was an undercover agent); *Moran v. Burbine*, 475 U.S. 412, 433-34 (1986) (where police fail to inform suspect of attorney's efforts to reach him, neither *Miranda* nor the Fifth Amendment requires suppression of prearraignment confession after voluntary waiver).

At the outset, the Court notes that Mr. Hitselberger was treated with both respect and kindness. *See generally* Govt's Ex. 21-22. Mr. Hitselberger's interviewers attempted to ensure that he was comfortable and spoke with him in a calm and conversational tone. *Id.* At no time does it seem as if the interviewers attempted to coerce, intimidate, cajole, or trick Mr. Hitselberger into an involuntary confession. *Id. See also generally,* Tr. of Mot. Hr'g, Sept. 6, 2013. With this in mind, this Court turns to the specific *Miranda* analysis.

### B. Pre-*Miranda* Statements made on April 11, 2012

Mr. Hitselberger seeks to suppress the statements made on April 11, 2012 during the 35 minute interview prior to reading and signing a *Miranda* waiver. Def.'s. Mot. to Suppress, March 1, 2013, ECF No. 42. Defendant argues that Special Agent Kesici questioned Mr. Hitselberger directly during this time period, which thus constituted an "interrogation" for purposes of

*Miranda*. Def.'s Supp. Mem., 4, Aug. 13, 2013, ECF No. 72. Because Mr. Hitselberger experienced custodial interrogation without any *Miranda* warnings, he seeks to suppress these statements as a violation of his Fifth Amendment right against self-incrimination. *Id.*

Although *Miranda v. Arizona* expanded the Fifth Amendment's protections against self-incrimination beyond criminal court proceedings, *Miranda v. Arizona*, 384 U.S. 436, 467 (1966), the Court was clear that the protections applied in only those situations in which a suspect's interview rose to the level of a "custodial interrogation." *Id.* at 468, 477. Thus, a police "inquiry of persons not under restraint" would not fall under *Miranda's* purview as those individuals would not be in police "custody." *Id.* at 478. Similarly, officers must administer the *Miranda* warnings only when the officer's questioning rises to the level of an "interrogation." *Id.* "Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence." *Id*. In essence, the *Miranda* warnings are pre-requisites to the admissibility of only those statements made by the defendant in a custodial interrogation. *Id.* at 477. The Government does not dispute that Defendant was in custody at the time of his interview. The only issue then, is whether his interview constituted an "interrogation."

"Interrogation" under *Miranda* has been defined by the Supreme Court to include both express questioning and its functional equivalent, that is "words or actions…that the police should know are reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). This latter test "focuses primarily upon the perceptions of the *suspect*, rather than the intent of the police…A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation." *Id*. (emphasis added). The police cannot however be held liable "for the unforeseeable results of their words or actions." *Id.* at 302.

Mr. Hitselberger first argues that Agent Kesici admitted to directly questioning him while he was in NCIS custody and that such questioning is sufficient to satisfy the interrogation test as it is "express questioning." Def.'s. Supp. Mem. at 4. This argument would require the Court to adopt a per se rule: that all express questioning constitutes interrogation, regardless of the quality of the questioning. However, this circuit has rejected just such a per se rule. *United States v. Bogle*, 114 F.3d 1271, 1274-5 (1997). For example, the D.C. Circuit has followed its sister circuits in carving out a "routine booking" exception. *See e.g., United States v. Venture,* 85 F.3d 708, 711 n.4 (1st Cir. 1996); *United States v. Sweeting*, 933 F. 2d 962, 965 (11th Cir. 1991); *United States v. Cota*, 953 F. 2d 753, 758 (2d Cir. 1992); *United States v. Monzon*, 869 F. 2d 338, 342 (7th Cir. 1989); *United States v. Taylor*, 799 F. 2d 126, 128 (4th Cir. 1986); *United States v. Gonzales-Mares*, 752 F. 2d 1485, 1489 (9th Cir. 1985).

This circuit has additionally held that "even in cases involving express questioning, there is no interrogation triggering the protections of *Miranda* unless, in the totality of the circumstances, the officer's questions were reasonably likely to elicit an incriminating response." *Bogle*, 114 F.3d at 1275 (internal quotations omitted). This is because, as *Innis* itself recognized, "interrogation, as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself." 446 U.S. at 300. Thus, express questioning without that additional level of coercion cannot, by itself, give rise to *Miranda* protections. *Bogle*, 114 F.3d at 1275.

The Court thus analyzes Mr. Hitselberger's reasonable perceptions during the direct questioning. The record does not reflect exactly what questions were asked, how those questions were framed, and how much information was volunteered by Mr. Hitselberger himself. *See generally,* Tr. of Mot. Hr'g, Sept. 6, 2013. It is clear that Mr. Hitselberger was at least generally

9

asked: 1) how he was doing, 2) basic identifying information, such as his name, age and address, 3) how long he had been on the base, 4) his educational background and, 5) the languages he spoke. Tr. of Mot. Hr'g, 122-3; Govt's Ex. 11, 12. It is further clear that the conversation between the agents and Mr. Hitselberger was conversational, and that Mr. Hitselberger was overly forthcoming with information, especially regarding his relationship with his co-workers and his educational background. Tr. of Mot. Hr'g, 191.

The Court finds that there was no "interrogation" during the 35 minute pre-*Miranda* interview because: 1) the agents asked only standard questions which were unlikely to elicit incriminating responses, and 2) the agents had no additional knowledge that Mr. Hitselberger was unusually susceptible to their standard questions. *See Innis*, 446 U.S. at 302 n.8.

Standard questions that ask the suspect basic identifying questions are unlikely to elicit incriminating responses and are thus not coercive enough to establish an "interrogation." *See e.g.*, *United States v. Edwards,* 885 F. 2d 377, 385–86 (7th Cir.1989) ("In our opinion, questions such as 'what is your name?' and 'where do you live?' will not usually constitute interrogation within the meaning of *Miranda*"; this is true even if these questions are asked at the time of arrest, rather than during the booking process); *Guiterrez, supra,* 92 F.3d at 471 ("Prior to or after arresting a suspect, law enforcement officers may ask preliminary questions as to identity, but they may not conduct a custodial interrogation"); *United States v. Foster,* 227 F.3d 1096, 1102–03 (9th Cir.2000) ("a definition of interrogation that included any question posed by a police officer would be broader than that required to implement the policy of *Miranda* itself; [o]nly questions reasonably likely to elicit an incriminating response from the suspect amount to interrogation") (citations and quotation marks omitted; punctuation altered for clarity).

The questions here were already pre-printed on a standard form and included the categories identified above: name, age, address, educational background, employment, identifying characteristics. Tr. of Mot. Hr'g, 124; Govt's Ex. 12. Although these questions do not necessarily fall under the "routine booking exception," as they are not questions "necessary to complete booking or pre-trial services," they still have the same quality as the questions asked during routine booking. *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990). *M*any of the questions ask only the most basic identifying characteristics of any interviewee. And the questions are no more than conversation starters to help the agents "establish a rapport" with the interviewees. Tr. of Mot. Hr'g, 123. For example, one would not expect the simple question "how are you?" to elicit intimate information about the interviewee's rocky relationship with his co-workers, as it did here. *Id.; Bogle*, 114 F.3d at 1275.

Moreover, the interviewing agents had no personal knowledge of Mr. Hitselberger's susceptibilities. *See Innis*, 446 U.S. at 302 n.8 ("Any knowledge the police may have had concerning the unusual susceptibility of a defendant to a particular form of persuasion might be an important factor in determining whether the police should have known that their words or actions were reasonably likely to elicit an incriminating response from the suspect."). The interviewing agents had never met or even heard of Mr. Hitselberger before, and had no indication that their basic questions would elicit such forthcoming responses. Tr. of Mot. Hr'g, 104-5. It is true that Agent Kesici had spoken with Lieutenant Commander David Peck prior to interviewing Mr. Hitselberger, and had discovered that Mr. Hitselberger had been having some difficulty with his co-workers at the time. Tr. of Mot. Hr'g, 207-8. Even armed with this information however, Agent Kesici would not know that Mr. Hitselberger would volunteer this

same information immediately upon being asked "how he has been doing lately and how things are going?" Tr. of Mot. Hr'g, 121.

In a similar vein, Special Agents Kesici and Fowler had no information about Mr. Hitselberger's education and background. Tr. of Mot. Hr'g, 104-5. Yet, when Mr. Hitselberger was asked about his education, he spoke at length, describing his background and his ties to the Hoover Institute at Stanford. Tr. of Mot. Hr'g, 190-1. This answer went well beyond any foreseeable answer to the agents' questions about Mr. Hitselberger's education or employment, as he never attended or worked at Stanford University. *See Innis*, 446 U.S. at 301-302 ("[S]ince the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend to only words or actions that…police officers…*should have known* were reasonably likely to elicit an incriminating response."). In fact, Agent Fowler noted that Mr. Hitselberger provided more information than was typical in such an interview and that the agents were "listening more than speaking during the interview." Tr. of Mot. Hr'g, 191-2.

Again, the Court emphasizes the conversational and relaxed nature of the interview. Mr. Hitselberger seemed talkative, seemed to enjoy the conversation and even began speaking to an Agent in a shared foreign language. Tr. of Mot. Hr'g, 191-2. And the interviewing agents did not ask Mr. Hitselberger any questions about the stop earlier that day, or the documents that were found, until after obtaining a *Miranda* waiver. Tr. of Mot. Hr'g, 125.

Given this record, and the generic nature of the questions asked, the Court does not believe that the Agents could reasonably have known that the questions would elicit incriminating responses. Because the questioning did not rise to the level of an "interrogation," the Court finds no *Miranda* violation and thus no justification to suppress these statements.

**C. Voluntariness of the *Miranda* Waiver on April 11, 2012, April 12, 2012, and October 25, 2012.**

Mr. Hitselberger next argues that the *Miranda* waivers executed on April 11, 2012, April 12, 2012 and October 25, 2012 were not voluntary and thus that statements made after those waivers should be suppressed. Specifically, he argues that the agents' attempt to "establish rapport," prior to providing the *Miranda* warnings was a coercive technique similar to those explicitly discussed in *Miranda v. Arizona*, and undermined the effective functioning of his *Miranda* warnings. Def.'s Supp. Mem. 8-9. Mr. Hitselberger additionally argues that his *Miranda* waiver on October 25, 2012 occurred while he was exhausted, and was thus not "voluntary, intelligent and knowing." Def.'s Mot. to Suppress at 6. He thus seeks to suppress these statements as well.[2]

It is long settled that "after being initially advised of his *Miranda* rights, the accused may himself validly waive his rights and respond to interrogation." *Edwards v. Arizona*, 451 U.S. 477, 484 (1981); *North Carolina v. Butler,* 441 U.S. 369, 372-6 (1979). However, any waiver made following the *Miranda* warnings must be "knowing and voluntary." *Butler*, 441 U.S. at 373. Voluntariness is determined using a totality-of-circumstances approach, which requires the court to inquire into the defendant's age, experience, education, background, intelligence, and circumstances surrounding the interrogation, among other factors. *Fare v. Michael C.*, 442 U.S.

---

[2] In his reply brief, Defendant states that "Mr. Hitselberger has not raised a *Miranda* issue with regard to the October statements because the government has indicated that it does not intend to use these statements in its case-in-chief," but then also argues that the "statements were involuntary" and thus inadmissible "for any purpose." Def.'s Reply in Support of Mot. to Suppress, 1, 1 n.1, May, 10, 2013, ECF No. 59. Based on this language, it is unclear whether Defendant still moves to suppress the October 25th statements. Insofar as the Defendant does still seek to suppress these statements, the voluntariness of Mr. Hitselberger's October 25th *Miranda* waiver is discussed above.

707, 725 (1979); *Brewer v. Williams*, 430 U.S. 387, 404 (1977); *Faretta v. California*, 422 U.S. 806, 835 (1975); *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938).

The Supreme Court has further noted that "[a]n express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver." *Butler*, 441 U.S. at 373. Of course, the ultimate inquiry is "not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case." *Id.* Still, *Miranda* only intended to combat compelling pressures which would undermine the individual's free will to confess. *Id.* at 374. *Miranda* will not suppress statements following execution of a valid waiver.

Mr. Hitselberger argues that on April 11, 2012, he was coerced into waiving his *Miranda* rights as agents used a coercive interrogation technique of questioning the suspect in "successive, unwarned and warned phases." Def.'s. Supp. Mem. at 7. Defendant cites to *Missouri v. Siebert*, which explains that a question-first, warn-second tactic undermines the effectiveness of the *Miranda* warnings, as a suspect would "hardly think he had a genuine right to remain silent, let alone persist in so believing" once he gives a confession and the police begin leading him "over the same ground again" after administering *Miranda* warnings. 542 U.S. 600, 611-3 (2004).

While the "question-first, warn-second" tactic can indeed be coercive, as seen in the facts of *Siebert*,[3] no tactic is per se unconstitutional. As usual, the totality of the circumstances must be considered to determine whether the defendant waived his rights "knowingly and

---

[3] In *Missouri v. Siebert*, the police officer began questioning the suspect after awakening the suspect at 3 a.m. at the hospital, where the suspect was being treated for burns. 542 U.S. 600, 605 (2004). The officer purposely refrained from giving the suspect any *Miranda* warnings in the hopes that he could elicit a *confession* of the crime. *Id.* The officer used slight physical force and questioned the suspect directly of the alleged crime. *Id.* When the suspect finally confessed, the officer executed the *Miranda* warnings and obtained a signed waiver, after which he merely asked her to repeat her previous confession. *Id.*

voluntarily." In *Siebert*, the Supreme Court focused on the calculated nature of the officer's two-step inquiry, designed as a matter of policy in his jurisdiction to obtain an admissible confession by "withholding *Miranda* warnings until after interrogating and drawing out a confession." *Seibert*, 542 U.S. at 609-610. The manifest purpose behind such a tactic is to "get a confession the suspect would not make if he understood his rights at the outset." *Id.* at 613. *Miranda* "warnings only in the aftermath of interrogation and just after making a confession" would hardly convince a suspect to "think he had a genuine right to remain silent, let alone persist in so believing once the police led him over the same ground again." *Id.* at 613.

The technique used here is not even close to the calculated two-step inquiry in *Siebert*. The agents only asked general questions, with the purpose of establishing rapport with Mr. Hitselberger, not to elicit a confession. Tr. of Mot. Hr'g, at 164-5. In fact, the agents did not ask Mr. Hitselberger even a single question regarding the precipitating incident until after the *Miranda* waiver had been signed, again proof that they had no intent to coerce an unwarned confession. Tr. of Mot. Hr'g, at 125; Govt's Ex. 12. And again, there is no indication that the agents had any inside knowledge of Mr. Hitselberger's susceptibilities to their general rapport building questions. *See infra*, Part III.C.

In addition, Mr. Hitselberger is a highly educated man who has the capability and the education to understand the *Miranda* warnings. He attended Georgetown University, where he studied Arabic, and the University of Texas, where he worked on a PhD in politics and government. Govt's Opp'n to Mot. to Suppress, Ex. 2, Results of Interview with Hitselberger, April 5, 2013, ECF No. 46. These schools are both top universities in the United States and difficult ones to get admission into. Mr. Hitselberger speaks multiple languages and was employed as a translator on the base in Bahrain. Govt. Ex. 12. And at the time the waiver was

15

administered, Mr. Hitselberger was read each right, asked if he had any questions pertaining to that right, and initialed his understanding of each right in the left-hand margin. Tr. of Mot. Hr'g, 125-27.

A similar process occurred on April 12, 2012 and on October 25, 2012. There are of course a few differences in the waiver circumstances, but none which change the analysis significantly. Mr. Hitselberger did not execute a new waiver on April 12, 2012, but was given the opportunity to again review the rights he had previously waived and the opportunity to retract the waiver. Tr. of Mot. Hr'g, 233-34. Again, Mr. Hitselberger affirmed his understanding of the *Miranda* rights, and voluntarily chose to speak with the interviewing agents. *Id.*

Mr. Hitselberger argues that on October 25, 2012 he was too tired to make a knowing and voluntary waiver of his rights. Def.'s. Mot. to Suppress at 6. Even if true, this fact alone is not sufficient to find that Mr. Hitselberger's waiver was not voluntary. Mr. Hitselberger seems coherent and cogent in the small video clip from this interview. *See* Govt's Ex. 22. And by this point, Mr. Hitselberger had already executed two previous *Miranda* waivers. A defendant's prior contact and experience with criminal procedure is to be considered in determining whether his waiver was knowing and voluntary. *See e.g., Fare v. Michael C.*, 442 U.S. 707, 725-6 (1979). The *Miranda* rights had not changed since his previous waivers, and even if Mr. Hitselberger's memory of the rights needed to be refreshed, the agents went through each right with Mr. Hitselberger again before he signed the waiver.

Given these facts, the Court finds that Mr. Hitselberger's waivers on April 11, 2012, April 12, 2012 and October 25, 2012 were knowing and voluntary. The statements obtained pursuant to this waiver do not violate the defendant's *Miranda* rights and should thus not be suppressed.

### D. Continued Questioning after Defendant's request for an attorney

Mr. Hitselberger next argues that on April 11, 2012 and April 12, 2012, NCIS agents continued questioning Defendant even after an explicit request for an attorney, thus violating Mr. Hitselberger's rights under the Fifth Amendment. Def.'s. Supp. Mem. 10-11. Mr. Hitselberger further asserts that after asking for an attorney, he did not "affirmatively state that he wanted to continue talking to the agents," as is required under *Miranda* before any questioning can continue. *Id.* at 11. Mr. Hitselberger twice requested an attorney: First on April 11, 2012, after which NCIS agents continued to question Mr. Hitselberger for another hour, and second on April 12, 2012, after which the agents continued to question Mr. Hitselberger for three hours. Govt. Ex. 11; Tr. of Mot. Hr'g, 235 – 240. He further argues that any conversation that occurred on April 12, 2012 only occurred as a result of the constitutional violation on April 11, 2012. Mr. Hitselberger thus asks that all statements after his request for an attorney on April 11, 2012 be suppressed.

After *Miranda*, "[i]f the individual states that he wants an attorney, the interrogation must cease until an attorney is present." 384 U.S. at 474. This is to protect the suspect's free choice from being overcome by continuing interrogation. *Id.* Of course, as the Defendant himself recognizes, a suspect may make a limited request for an attorney, such as solely for the purpose of providing a written statement. *Connecticut v. Barrett*, 479 U.S. 523, 529 (1987). In *Barrett,* the defendant accompanied this limited request with an "affirmative announcement of his willingness to speak with the authorities." *Id.* As is the case with every *Miranda* inquiry, there is no per se rule and the Court must consider the totality of the circumstances to determine whether the defendant made a voluntary and knowing choice to continue to speak after his request for an attorney. *Id.*

Defendant argues that all questioning ought to have ceased after his request for an attorney, including the agents' questions clarifying whether Mr. Hitselberger's request for an attorney was limited to reviewing a written statement. *Id.* at 10-11. However, as the Supreme Court held in *United States v. Davis, Miranda* protections are triggered only when the defendant's request for counsel is unambiguous and unequivocal. 512 U.S. 452, 458 (1994); *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991). If the suspect "makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel…precedents do not require the cessation of questioning." *Davis*, 512 U.S. at 459. As the Supreme Court went on to explain, "when the officers conducting the questioning reasonably do not know whether or not the suspect wants a lawyer, a rule requiring immediate cessation of questioning would transform the *Miranda* safeguards into wholly irrational obstacles to legitimate police investigative activity." *Id.* at 460 (internal quotations omitted); *Michigan v. Mosley*. 423 U.S. 96, 102.

"Of course, when a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney." *Davis*, 512 U.S. at 461. And that is exactly what happened here. On April 11, the agents asked Defendant whether he would provide a written statement memorializing the interview. Tr. of Mot. Hr'g, 127-28. Although Mr. Hitselberger's exact response at this point is not in the record, Agent Kesici testified that Mr. Hitselberger "hesitated and said that he'd feel more comfortable either consulting with a lawyer first or having a lawyer review his statement prior to providing it." Tr. of Mot. Hr'g, 128; Govt's Ex. 11. Thus, there was not an unambiguous statement that Mr. Hitselberger wanted counsel before he would answer additional questions.

It was then that the agents asked a question to clarify whether the defendant was actually requesting an attorney, and whether that request pertained only to the written statement. Tr. of Mot. Hr'g, 129; Govt's Ex. 11. Mr. Hitselberger's declaration that he would feel "more comfortable" with a lawyer is not a clear and unequivocal request for a lawyer, and a reasonable officer could be confused as to whether the Defendant was actually invoking his right to counsel before additional questioning took place, or whether he sought to have counsel only for a written statement. *See e.g.*, *U.S. v. Warren*, 2008 WL 3010156 at *14 (E.D.Mo. July 24, 2008). Because only unambiguous requests for counsel trigger the *Miranda* protections, and because the Defendant may make a limited request for an attorney solely for the purpose of providing a written statement, Mr. Hitselberger's rights were not violated when the agents sought clarification of his ambiguous request for counsel and, after such clarification was obtained, continued to question him.[4]

**E. Suppression of the Interviews as Fruits of an Unlawful Search and Seizure.**

Plaintiff finally argues that all statements made in the interviews should be suppressed as fruits of an unlawful search and seizure. *Wong Sun v. United States*, 371 U.S. 471, 488 (1963) (holding that evidence obtained through the exploitation of a Fourth Amendment violation must be suppressed as fruits of a constitutional violation). Mr. Hitselberger has fully argued these

---

[4] The record is even less informative on how, and in what manner, Mr. Hitselberger requested an attorney on April 12, 2012. As Agent Kesici testified, "[i]nitially [Defendant] mentioned if Agent Fowler or I would look at the document before he signed off, and then that the idea of maybe a legal advisor should read into it before he signs off on it, brought that up." Tr. of Mot. Hr'g, 235. Following this exchange, it seems that Agent Kesici clarified that this request for an attorney was purely for the written statement. Tr. of Mot. Hr'g, 235-36. As a result, no written statement was ever completed. Tr. of Mot. Hr'g, 236. Again, there is no indication that Defendant ever requested an attorney for the oral interview. The Court finds that, on the record provided, Defendant's request for a lawyer on April 12, 2012 was ambiguous and thus the following oral interview, including any clarification questions, were not a violation of Defendant's *Miranda* rights.

Fourth Amendment claims in his Motion to Suppress Tangible Evidence Seized Following Unlawful Stop and Search of Backpack. Def.'s Mot. to Suppress Tangible Evidence, March 1, 2013, ECF No. 39. Specifically, Mr. Hitselberger argues that the search was conducted without a warrant, and no exception to the warrant requirement justified the warrantless search. The Court has separately analyzed and rejected Defendant's motion to suppress. In its opinion, this Court found that an exigent circumstance justified the warrantless search of the Mr. Hitselberger's backpack: the recovery of the classified documents Mr. Hitselberger had printed. *See* Mem. Op. denying Def.'s Mot. to Suppress Tangible Evidence, 14-16, March 5, 2014, 88. This Court found that the recovery of these documents was urgent, because the dissemination of classified information could put lives at risk, and the intrusion into Mr. Hitselberger's privacy was small in comparison. *Id.* at 15. Because the stop and search of Defendant's backpack was not unlawful, the interviews are not fruits of an unlawful stop and search, and do not need to be suppressed under the Fourth Amendment.

## IV. CONCLUSION

For the foregoing reasons, Defendant's motion to suppress statements is DENIED. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: March 26, 2014　　　　　　　　　　　　　　　　　　　RUDOLPH CONTRERAS
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　United States District Judge