UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA            :

            v.                      :        12-CR-231 (RC)

JAMES F. HITSELBERGER               :

### DEFENDANT'S SENTENCING MEMORANDUM

On April 25, 2014, James F. Hitselberger entered a guilty plea to a one count misdemeanor offense of unauthorized removal and retention of classified documents, in violation of 18 U.S.C. § 1924. He will appear before this Honorable Court for sentencing on July 17, 2014. Through undersigned counsel, Mr. Hitselberger respectfully submits the following information for the Court's consideration in determining an appropriate sentence. For the reasons set forth below, and such other reasons as may be presented at the sentencing hearing, Mr. Hitselberger respectfully requests that the Court impose a sentence of time served with no term of supervised release or probation.

### Factual Background

Mr. Hitselberger is 57 years old and has never before been charged with or convicted of a criminal offense. The offense at issue here did not arise out of any specific criminal intent but simply out of Mr. Hitselberger's intellectual curiosity and a lapse in judgment. As the evidence presented at the motions hearing demonstrated, Mr. Hitselberger signed on to his secure email account within a restricted access area on the Naval Base in Bahrain and began reading classified documents that were sent to him via email. When a Master Sergeant who was standing nearby

told Mr. Hitselberger that he needed the computer and Mr. Hitselberger would have to sign off,

Mr. Hitselberger decided to read the documents in his living quarters. He then -- in full view of

the Master Sergeant and with other military personnel in the surrounding area -- printed the

documents, put them in his backpack and walked out of the secured area. For doing so, he

already has been severely punished, and no additional punishment is necessary to serve the

purposes of sentencing.

Mr. Hitselberger was born in Detroit, Michigan and lived there with his parents until he

was four years old, when his family moved to Wisconsin. He attended school in Wisconsin until

his parents enrolled him in boarding school at Choate High School in Connecticut.

Mr. Hitselberger developed an interest in foreign languages while studying Russian in

high school. After graduating from Choate High School in 1975, he studied Arabic in Libya and

in Iran prior to the Iranian revolution. He studied history and Arabic at Georgetown University,

earning a Bachelor of Science degree in 1980. He later attended graduate school at the

University of Texas in Austin. He is fluent in Arabic, Farsi and Russian. He worked as a

Department of Defense civilian contract linguist for a number of years, including in Iraq from

2004 to 2007.

Working in Iraq, particularly while stationed in Fallujah, was extremely stressful. Iraq

was, of course, a war zone and translators were needed in some of the most dangerous areas.

Mr. Hitselberger served at bases in Baghdad, Ramadi, Fallujah, and an area south of Baghdad

known as "the Triangle of Death." He was constantly in danger from improvised explosive

2

devices.[1]  At one point, a mortar landed approximately 30 feet from him on a base in Ramadi. On another occasion, he left his job at a checkpoint, only to learn later that a suicide bomber attacked the checkpoint a short time later, killing several troops.  He worked at a major checkpoint in Fallujah, developing local contacts to uncover caches of ammunition and explosives intended for use against U.S. troops.  Although the work was dangerous, the interpreters in Iraq were critical to the mission of the troops, and Mr. Hitselberger is rightfully proud of the work he did there.  *See* Attachment N (commendations regarding work in Iraq).

The stress of the work, however, took a toll on Mr. Hitselberger, and his family noted a change in him when he returned.  *See* Attachment A (letter from James F. Hitselberger, M.D.); *see also* PSR ¶ 50.  In 2007, he realized he needed a break and took time off from working as an interpreter.  He spent time renovating houses in the Upper Peninsula of Michigan, and supported himself with rental income and his savings.

In June 2011, Mr. Hitselberger decided he needed to return to full-time work and took a position as a linguist with Global Linguist Solutions.  He was assigned to work as a contract interpreter for the U.S. Navy in Bahrain (Naval Support Activity - Bahrain).  According to at least one witness interviewed with regard to the instant matter, Mr. Hitselberger was very good at his job.  He worked hard to ensure accurate translations and volunteered to provide his superiors with translations of local press reports in order to ensure that the military was familiar with the local community.

---

[1] An estimate 1,000 interpreters were killed during the war in Iraq.  *See* Doug Bandow, *Endangered Wartime Interpreters: The U.S. Should Protect Those Who Protect Us*, N.Y. Times, Feb. 25, 2013, *available at* http://www.forbes.com/sites/dougbandow/2013/02/25/endangered-wartime-interpreters-the-u-s-should-protect-those-who-protect-us/.

The charged offense arose out of an incident that occurred on April 11, 2012, when Mr. Hitselberger printed the documents in front of the Master Sergeant and walked out of the restricted access area.   He was stopped a short distance from the office, and Navy officials retrieved the two documents from his backpack.  Mr. Hitselberger was initially permitted to go on his way, but was soon called back to the secured facility to speak to NCIS investigators.  As reflected in an NCIS report, Mr. Hitselberger "appeared emotionally distraught" and was "weeping and sobbing" when speaking of his relationships with fellow employees and an instance when he was not invited to a party.  With regard to the documents, he recognized he made a mistake.  Following the interview, he was assigned to a new room on the base and permitted to leave the NCIS offices for the evening.  The following day, he again met with NCIS investigators at their request and answered their questions.  At the conclusion of the second interview, the NCIS agents asked Mr. Hitselberger for a mailing address where they could send his personal property after he left the base.  Mr. Hitselberger provided his address in Ontonagon, Michigan, along with the telephone number for his home and his gmail email address.  He also provided a Yahoo! email address.

Mr. Hitselberger was then permitted to return to his originally assigned room and pack a bag for his impending departure from Bahrain.  Mr. Hitselberger was told that his company, Global Linguistic Services, had arranged for a ticket for him to leave Bahrain, return to the United States and "out-process" from the company due to the security violation -- in other words, he was being fired.  Mr. Hitselberger was provided with an airline ticket to return to the United States, via Frankfurt, Germany, and was taken to the airport, where he boarded an airplane.

4

Military officials told Mr. Hitselberger only that he had to leave Bahrain and would no longer be employed by Global Linguistic Services. Although he was told that his company would formally "out-process" him when he returned to the United States, he was not told that he was required to return to the United States, and he was not told that NCIS or any other law enforcement agency had any need to speak to him further at that time. While it was clear that NCIS thought he had committed a serious security violation and intended to investigate him further, he was not told that he would be charged with a criminal offense or even that NCIS investigators thought that he had committed a criminal offense. Mr. Hitselberger was not asked to stay in contact with NCIS or any other law enforcement officials.

After leaving Bahrain, Mr. Hitselberger's flight stopped in Frankfurt, Germany. Because he felt ill and unable to travel, he decided not to continue on the flight. Instead, he notified his employer that he was not continuing on the flight and checked himself into a hotel in Germany. Over the next six months, he traveled to a number of European countries, including Albania and the United Kingdom. He did so using his U.S. passport and never tried to conceal his identity or location.

As NCIS reports confirm, during this time period, Mr. Hitselberger stayed in contact with his former employer and his family and friends, and on at least two occasions, emailed one of the U.S. Army officials who had stopped him when he left the secured facility on April 11th. He regularly checked the email account addresses that he had given the NCIS investigators on April 12th. He expected that if law enforcement officials wanted to contact him, they would do so through the contact information he gave NCIS or through his former employer. No law enforcement official ever tried to contact him through the email addresses he provided.

5

Instead, on August 6, 2012, the government filed a sealed complaint charging

Mr. Hitselberger with one count of unlawful retention of national defense information, in

violation of 18 U.S.C. § 793(e). Mr. Hitselberger was not notified that the complaint was filed or

that a warrant had been issued for his arrest. Although the government had Mr. Hitselberger's

email contact information and knew that his employer, as well as the U.S. Army official, were

able to contact Mr. Hitselberger, no government agent ever contacted Mr. Hitselberger or asked

him to return to the United States to answer to the charges. Because the complaint was sealed,

Mr. Hitselberger had no way of knowing he had been charged.

While traveling in Europe, Mr. Hitselberger was in frequent contact with his former

employer and wanted to obtain his personal belongings that he left behind in Bahrain. In late

September 2012, his former employer notified him that if he traveled to Kuwait, he could pick up

the possessions at a U.S. military base there. He was told that he would have to be escorted onto

the base to retrieve his property. Mr. Hitselberger had no fear of going to the military base in

Kuwait to retrieve his belongings and voluntarily traveled to Kuwait to do so, because he was not

hiding from U.S. officials or anyone else. When he arrived in Kuwait on October 24, 2012[2], his

passport was confiscated and he was arrested. Until then, he did not know he was charged with a

criminal offense.

Upon his arrival in the United States, on October 25, 2012, the government agents took

Mr. Hitselberger to an office in Virginia, where he again agreed to speak with them. At his

initial appearance on October 26, 2012, the government sought and obtained pretrial detention,

---

[2]The Pretrial Services Report ("PSR") incorrectly lists Mr. Hitselberger's arrest date as October 26, 2012. *See* PSR at 1. That was the date of his initial appearance. Counsel apologizes for not recognizing this mistake prior to the submission of the final PSR.

arguing that Mr. Hitselberger was a flight risk, despite the fact that Mr. Hitselberger had made no

effort to hide his whereabouts after he left Bahrain, traveled openly using his passport, and was in

contact with his friends, former employer and military officials.  Mr. Hitselberger was then held

without bond at the District of Columbia Jail.

Fifty-four days later, following a hearing on December 19, 2012, the Court granted

Mr. Hitselberger's Motion to Reconsider the Detention Order, and ordered Mr. Hitselberger

released to the High Intensity Supervision Program.  As a conditions of his release,

Mr. Hitselberger was required to live with his aunt in Northern Virginia and to wear an ankle

monitor.  He was confined to his aunt's home for almost eight months with only limited

exceptions for pre-authorized appointments, such as for legal appointment, doctors visits and

church services.  He fully complied with those conditions, and on August 6, 2013, the Court

modified the conditions of Mr. Hitselberger's release, removing him from the HISP program and

permitting him to move back to his home in Michigan, but requiring that he remain on GPS

monitoring.  On March 27, 2014, without objection from the government, the Court terminated

the GPS monitoring condition.  Throughout the more than 18 months that Mr. Hitselberger has

been on pretrial release, he has fully complied with every condition imposed.

## **Argument**

When imposing a sentence, the Court must consider:

> (1) the nature and circumstances of the offense and the history and
>     characteristics of the defendant;
>
> (2) the need for the sentence imposed –
>
> > (A) to reflect the seriousness of the offense, to promote respect
> >     for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for [the applicable offense and the applicable category of defendant as set forth in the Sentencing Guidelines];

(5) any pertinent policy statement [issued by the Sentencing Commission];

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

See 18 U.S.C. § 3553(a); *United States v. Booker*, 543 U.S. 220, 259 (2005).

Congress has further provided that:

> [t]he court, in determining whether to impose a sentence of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in Section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation.

See 18 U.S.C. § 3582 (emphasis added). With that limitation and considering all of the purposes of sentencing, the Court must impose a sentence that is "sufficient, *but not greater than necessary*, to comply with the purposes [of sentencing]." 18 U.S.C. § 3553(a) (emphasis added).

8

(1)     **The United States Sentencing Guidelines.**

As set forth in the Presentence Investigation Report ("PSR"), the recommended sentencing range under the United States Sentencing Guidelines is 0 to 6 months. The requested sentence of time served (approximately two months) is within this range.

(2)     **The Nature and Circumstances of the Offense.**

Mr. Hitselberger does not dispute that the mishandling of classified documents under any circumstances is a serious offense. The circumstances of the instant offense, however, demonstrate that Mr. Hitselberger did not intend to disclose classified materials to unauthorized individuals or intend to undermine the integrity of the information contained in the documents at issue. He took the documents out of the restricted access area only to read in his living quarters on the base. These documents were sent to him (and numerous other individuals working on the naval base), and he was authorized to read them. His mistake was printing them and taking them out of the restricted access area. He did this in full view of military personnel, demonstrating that he did not stop to think about what he was doing or specifically make a well-thought, deliberate or calculated decision to thwart the rules for handling classified materials. Instead, his conduct was the result of a lapse in judgment.

(3)     **The History and Characteristics of the Defendant.**

Mr. Hitselberger cannot fully explain this lapse in judgment, because he simply did not put a great deal of thought into his actions. The evidence demonstrates that at the time of the offense he was experiencing some emotional instability. When talking to government investigators, he placed a great deal of emphasis on his lack of friendships

with others on the base and his feelings of being excluded.  He cried when explaining

that he had been excluded from a party on the base -- an unusually emotional reaction to

such a small matter.  His family believes that his emotional instability in Bahrain was

related to the trauma he experienced while serving as an interpreter in Iraq and perhaps

working again in a military environment raised the same feelings of stress and trauma he

had experienced in Iraq.  Regardless of the cause of his actions, these actions were out of

character.

As the attached letters demonstrate, apart from the instant offense,

Mr. Hitselberger has led a very respectable, law-abiding and productive life.  He worked

hard to obtain an education and to learn several different languages.  He served his

country honorably as a civilian contract interpreter during the war in Iraq.  He has been

honest, kind and generous with his friends and family, and he is a modest person who

lives a modest lifestyle.  His lapse in judgment that led to the instant offense does not

accurately represent his true character.  Rather, the numerous letters submitted on his

behalf by loyal and dedicated friends, his education and work history, and his service to

his country demonstrate his true character.  *See* Attachment B (letter from Shaun M.

Jordan); Attachment C (letter from Oliver van den Berghe); Attachment D (letter from

Mark Lehman); Attachment E (letter from Charles and Judy Perkins); Attachment F

(letter from Robin Stalling s); Attachment G (letter from Mark Randall); Attachment H

(letter from Ali Olaikan); Attachment I (letter from Mary Lawton); Attachment J (letter

from Margaret Huffstickler); Attachment K (letter from Preston Smith); Attachment L

(letter from Dr. Hamid Rezai); Attachment M (letter from Josh Lasch).

(4)     **The Purposes of Sentencing.**

The Sentencing Reform Act requires the Court to impose a sentence that not only

will reflect the seriousness of the offense and promote respect for the law, but also will

provide just punishment, afford deterrence to criminal conduct, and protect the public

from further crimes of the defendant.  Under the circumstances of this case, a sentence of

incarceration is not necessary to serve these purposes of sentencing, nor is any sentence

of supervised release, probation or a fine.

Mr. Hitselberger has been significantly punished for his involvement in the

instant offense.  He lost his job as a interpreter; he has lost the ability to obtain a security

clearance necessary for similar employment; he experienced the humiliation of being

arrested in Kuwait and escorted back to the United States; he was detained at the District

of Columbia Jail for 54 days; he was on home confinement with electronic monitoring

for almost eight months; he was on electronic monitoring confined to the isolated county

where he resides in Michigan for almost eight additional months; he experienced the

humiliation of having every aspect of his life fully investigated and numerous family

members, friends and acquaintances interviewed by federal agents; and he now has a

criminal conviction on his record.  He needs no further punishment to be deterred from

future crimes, and the general deterrent effect of the price Mr. Hitselberger has paid is

sufficient to deter others with access to classified documents and encourage them to

strictly abide by the handling requirements.  Mr. Hitselberger is not a threat to anyone

and incarceration is not necessary to protect the public.  During the more than 18 months

that he has fully abided by the conditions of pretrial release, he has demonstrated that he

is a well-adjusted, educated, productive citizen who is not in need of any supervision.

**(5)     The Kinds of Sentences Available.**

Here, the Court can and should impose a sentence of time served without a term

of supervised release or probation.  Although the Court is authorized to impose a term of

supervised release or probation, the Court is not required to do so, and for the reasons set

forth above, no such term is necessary to serve the purposes of sentencing.

**(6)     The Need to Avoid Unwarranted Disparities.**

A sentence of time served is within the Guidelines sentencing range and would

not cause any unwarranted disparity.  In fact, a sentence of time served with no additional

penalty should be imposed to avoid an unwarranted disparity by punishing

Mr. Hitselberger more severely than similarly situated defendants.  Other defendants who

have entered guilty pleas to the misdemeanor offense of unauthorized removal and

retention of classified documents, in violation of 18 U.S.C. § 1924, have been sentenced

to terms of probation and served no jail time.  *See United States v. Berger*, 05-mj-175

(DAR), Dkt. # 17 (D.D.C. Sept. 13, 2005) (former very high level official took

documents from archives, destroyed at least one document, entered plea to misdemeanor

§ 1924 violation, and sentenced to two years probation); *United States v. Blauvelt*,

06-cr-71 (HBG), Dkt. #10 (E.D. Tenn. Oct. 25, 2006) (contractor for National Nuclear

Security Administration gathered "personal and potentially compromising" information

about fellow employees, removed secret information and stored substantial amount of

classified information at home, deleted information when search warrant executed,

entered plea to misdemeanor § 1924 violation, and sentenced to one year probation); *United States v. Uppal*, 07-mj-274 (BRP), Dkt. # 3 (E.D. Va. Mar. 29, 2007) (Boeing employee who stored classified information relating to design and control of highly sensitive missiles, radar systems, and aircraft control systems at his home and in commercial storage unit -- seventeen classified documents consisting of 241 pages which had been gathered over the course of a number of years -- entered plea to misdemeanor § 1924 violation, and sentenced to one year probation); *United States v. Kirby,* 07-mj-463 (TRJ), Dkt. # 6 (E.D. Va. Jun. 8, 2007) (Defense logistics Agency employee who regularly -- on 50 to 60 occasions -- took classified documents home, lost thumb drive in parking lot, reported loss, lied about finding drive, and had Top Secret information on his home computer entered plea to misdemeanor § 1924 violation, and sentenced to $500 fine); *See also United States v. Drake*, 10-cr-181 (RDB), Dkt. 169 (D.Md. Jul. 15, 2011) (high level government employee sentenced to one year probation after entering plea to misdemeanor offense of exceeding authorized use of a computer, in violation of 18 U.S.C. § 1030, and government dismissed charges including wilful retention of national defense information, based on repeated disclosure of information to reporter over course of at least two years).

(7)     **Restitution and Fines.**

Restitution is not applicable because Mr. Hitselberger's conduct did not cause a financial loss.

The Court also should not impose a fine because Mr. Hitselberger has suffered and will continue to suffer financially as a result of the offense. He lost his job and lost

his ability to find employment as a cleared interpreter -- perhaps the most lucrative position for which he is qualified. While he has some assets (property and relatively small amounts of cash), he will need to use these assets to support himself in the future. Placing any additional financial burden on him would further his punishment beyond what is reasonable for the offense of conviction and would not serve any purpose of sentencing.

## Conclusion

For all of the foregoing reasons and such other reasons as may be presented at the sentencing hearing, the Court should impose a sentence of time served without a term of supervised release or probation or any additional financial penalty.

Respectfully submitted,

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

/s/
_____
MARY MANNING PETRAS
Assistant Federal Public Defender
625 Indiana Avenue, N.W.
Suite 550
Washington, D.C. 20004
(202) 208-7500 ext. 109